[No. F057671. Fifth Dist. June 9, 2010.]

HOME BUILDERS ASSOCIATION OF TULARE/KINGS COUNTIES, INC., Plaintiff and Appellant, v.
CITY OF LEMOORE et al., Defendants and Respondents.

556

557

558

COUNSEL

Law Offices of Walter P. McNeill and Walter P. McNeill for Plaintiff and Appellant.

Dowling, Aaron & Keeler and Daniel O. Jamison for Defendants and Respondents.

OPINION

**LEVY, J.**—In late 2005, respondents, the City of Lemoore and the Lemoore City Council (City), engaged Colgan Consulting Corporation and Joseph Colgan (Colgan) to conduct a development fee impact study and prepare a report (Colgan Report). In late 2006 and early 2007 the City adopted various development impact fees based on the Colgan Report. Appellant, Home Builders Association of Tulare/Kings Counties, Inc. (HBA), challenged certain of these fees as being invalid under the Mitigation Fee Act (Gov. Code,[1] § 66000 et seq.).

The trial court upheld the majority of the disputed impact fees. HBA contends the trial court erred in that it applied an incorrect and excessively deferential "quantum of proof." HBA further argues that the various fees violate certain Mitigation Fee Act requirements. HBA also contends that some of these fees are preempted by the fees imposed for neighborhood and community parks that serve a subdivision under the Quimby Act (§ 66477).

As discussed below, the fire protection impact fee for the east side of the city is invalid in that it is not reasonably related to the burden created by the development project. However, the balance of the judgment upholding the remaining disputed fees will be affirmed.

## BACKGROUND

Between October and December 2006, the City received Colgan's findings on the development impact fee study. Based on this report, the City held public hearings on the adoption of various impact fees. In December 2006 and January and February 2007, the City adopted 13 impact fees for new housing in Lemoore.

In May 2007, HBA filed and served its first amended petition for writ of mandate and complaint. HBA challenged seven of the impact fees adopted

---

[1] All further statutory references are to the Government Code.

pursuant to the Colgan Report. According to HBA, the Colgan Report incorporated and applied a variety of accounting methods that are unlawful under the Mitigation Fee Act. Specifically, HBA objected to development impact fees for law enforcement, parkland acquisition and improvement, refuse vehicles and containers, fire protection, general municipal facilities, and community/recreational facilities. HBA also challenged the process by which the City accounts for and spends the impact fees collected.

The City initially demurred to the first amended petition/complaint and moved to strike all allegations that the fees were special taxes or proceeds of taxes, were excessive as such, and violated the California Constitution. The trial court overruled the demurrer but granted the motion to strike. HBA did not amend. Accordingly, all constitutional issues were removed and the case proceeded on the statutory claims raised by HBA as to the City's alleged noncompliance with the Mitigation Fee Act.

Thereafter, the City moved for summary judgment/summary adjudication. The trial court granted summary adjudication in the City's favor on the causes of action regarding the fire protection impact fees, police impact fees, municipal facilities impact fees, and the administration of the impact fees. The court concluded that the City had adequately demonstrated that it complied with the Mitigation Fee Act and that its determination of the amount of these disputed fees was neither arbitrary nor capricious. However, the court found that triable issues of material fact existed with respect to the causes of action regarding the parkland acquisition, parkland improvement, community/recreation, and refuse vehicle and container impact fees.

Following a trial on the remaining causes of action, the trial court ruled in favor of the City on the validity of those fees with one exception. The court invalidated the parkland improvement impact fee as applied to subdivisions subject to the Quimby Act.

## DISCUSSION

1. *The Mitigation Fee Act.*

■ At issue in this appeal is whether, in adopting the disputed impact fees, the City complied with the Mitigation Fee Act. This act embodies a statutory standard against which monetary exactions by local governments subject to its provisions are measured. (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 865 [50 Cal.Rptr.2d 242, 911 P.2d 429].) It was passed by the Legislature " 'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.' " (*Id.* at p. 864.)

The Mitigation Fee Act requires the local agency to identify the purpose of the fee and the use to which the fee will be put. (§ 66001, subd. (a)(1) & (2).) The local agency must also determine that both "the fee's use" and "the need for the public facility" are reasonably related to the type of development project on which the fee is imposed. (§ 66001, subd. (a)(3) & (4).) In addition, the local agency must "determine how there is a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed." (§ 66001, subd. (b).) "Public facilities" are defined as including "public improvements, public services, and community amenities." (§ 66000, subd. (d).)

2. *The standard of review and burden of proof.*

The City's adoption of the development impact fees under the Mitigation Fee Act involved a quasi-legislative action. (Cf. *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840, 849 [124 Cal.Rptr.2d 744].) Thus, the City's action is reviewed under the narrower standards of ordinary mandate. (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 328 [4 Cal.Rptr.2d 897].) Accordingly, judicial review is limited to an examination of the proceedings before the City to determine whether its action was arbitrary, capricious, or entirely lacking in evidentiary support. (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667 [42 Cal.Rptr.3d 868, 133 P.3d 1028].) The action will be upheld if the City adequately considered all relevant factors and demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 232 [1 Cal.Rptr.2d 818].) This issue is a question of law. (*Id.* at p. 233.)

As noted above, before imposing a fee under the Mitigation Fee Act, the local agency is charged with determining that the amount of the fee and the need for the public facility are reasonably related to the burden created by the development project. If such a fee is challenged, the local agency has the burden of producing evidence in support of its determination. (*Garrick Development Co. v. Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 329.) The local agency must show that a valid method was used for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development. (*Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th at p. 235.)

However, this burden of producing evidence is not equivalent to the burden of proof. "Attorneys, judges, and commentators often have confused these terms and the concepts they represent. As the United States Supreme Court observed, 'For many years the term "burden of proof" was ambiguous because the term was used to describe two distinct concepts. Burden of proof was frequently used to refer to what we now call the burden of persuasion—the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose. But it was also used to refer to what we now call the burden of production—a party's obligation to come forward with evidence to support its claim.' [Citations.]" (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1666–1667 [3 Cal.Rptr.3d 279].) Thus, the local agency has the obligation to produce evidence suficient to avoid a ruling against it on the issue. (*Mathis v. Morrissey* (1992) 11 Cal.App.4th 332, 346 [13 Cal.Rptr.2d 819].) However, this burden of producing evidence does not operate to shift the burden of proof. The plaintiff has the burden of proof with respect to all facts essential to its claim for relief and that burden remains. (*Ibid.*) Therefore, the plaintiff must present evidence sufficient to establish in the mind of the trier of fact or the court a requisite degree of belief. (*Sargent Fletcher, Inc. v. Able Corp.*, *supra*, 110 Cal.App.4th at p. 1667.)

In general, the imposition of various monetary exactions, such as special assessments, user fees, and impact fees, is accorded substantial judicial deference. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 671 [117 Cal.Rptr.2d 269, 41 P.3d 87].) In the absence of a legislative shifting of the burden of proof, a plaintiff challenging an impact fee has to show that the record before the local agency clearly did not support the underlying determinations regarding the reasonableness of the relationship between the fee and the development. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 444 [79 Cal.Rptr.3d 312, 187 P.3d 37].)

■ Accordingly, the local agency has the initial burden of producing evidence sufficient to demonstrate that it used a valid method for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development. If the local agency does not produce evidence sufficient to avoid a ruling against it on the validity of the fee, the plaintiff challenging the fee will prevail. However, if the local agency's evidence is sufficient, the plaintiff must establish a requisite degree of belief in the mind of the trier of fact or the court that the fee is invalid, e.g., that the fee's use and the need for the public facility are not reasonably related to the development project on which the fee is imposed or the amount of the fee bears no reasonable relationship to the cost of the public facility attributable to the development. (Cf. *Sinclair Paint Co. v.*

*State Bd. of Equalization* (1997) 15 Cal.4th 866, 881 [64 Cal.Rptr.2d 447, 937 P.2d 1350].)

There have been occasional comments from Courts of Appeal that the burden of proof in a fee case falls on the local agency. These cases cite *Beaumont Investors v. Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567] as support for this shift. However, in *Beaumont Investors*, the local agency failed to produce any evidence to support its calculation of the disputed fee. Thus, it was a failure to meet the burden of production, not the burden of proof. In ruling that the facilities fee was invalid because the local agency failed to develop a record from which costs reasonably related to the development could be determined, *Beaumont Investors* conflated the two concepts. In contrast, here the City produced a record to support the disputed fees. Thus, *Beaumont Investors* and its progeny are distinguishable.

Here, the standard applicable to ordinary mandate applies and there is no basis for shifting the parties' burdens. Thus, the City had the initial burden of producing evidence of the reasonableness of the relationship between the fee charged and the burden posed by the development. However, HBA had the burden of proving that the record before the City did not support the City's underlying determinations.

3. *Community/Recreation Facility Impact Fee (Resolution No. 2007-01).*

The City relied on the Colgan Report in adopting the various development impact fees. Colgan proposed the community/recreation facility impact fee to fund the cost of adding community and recreation facilities that will be needed to maintain the current level of service as the city grows. Colgan calculated these fees based on the existing ratio of community and recreation facility asset value to population, the rationale being that the need for such facilities is based on the size of the population to be served. Colgan determined that the City had invested $5,477,160 in existing community recreational facilities and then divided that number by the current population to arrive at the per capita cost. That cost was then multiplied times the population per unit of development type to arrive at the fee per unit. This calculation is known as the standard-based method.

Regarding future needs, Colgan noted that the existing community and recreation facilities are unique and will not be duplicated. These facilities

include the civic auditorium, a youth plaza skate park, a teen center, the train depot complex, and a golf course. Rather, the City intends to expand the range of recreational choices by constructing other types of facilities including a municipal aquatic center, a municipal gymnasium and fitness center, and a naval air museum. These facilities are expected to cost in excess of $5 million while the impact fee is projected to yield approximately $3.2 million.

HBA objects to the community/recreation facility impact fee on two grounds. HBA argues that the fee violates the Mitigation Fee Act's requirement that the public facilities be identified and that the fee is preempted by the Quimby Act.

### a. *The City adequately identified the public facilities.*

■ Section 66001, subdivision (a)(1) and (2), requires the City to "[i]dentify the purpose of the fee" and "[i]dentify the use to which the fee is to be put." If the use is financing public facilities, the facilities must be identified. However, the statute provides flexibility regarding how that identification may be made. It may, *but need not*, "be made by reference to a capital improvement plan as specified in Section 65403 or 66002, may be made in applicable general or specific plan requirements, or may be made in other public documents that identify the public facilities for which the fee is charged." (§ 66001, subd. (a)(2).) Similarly, Lemoore City Code section 8-10-3 requires that impact fee resolutions shall be adopted in accordance with the provisions of the Mitigation Fee Act. Regarding the content of such resolutions, Lemoore City Code section 8-10-2 requires the city council to "list the specific public improvements to be financed."

HBA contends the City disregarded these provisions in establishing the community/recreation facility impact fee in that no specific public improvements were identified. Rather, reference was made to examples of future facilities without any actual plan or commitment. The crux of HBA's complaint is the City's use of the standard-based method to calculate the fees to maintain the current level of service, i.e., the ratio of the value of existing facilities divided by the current population to arrive at the per capita cost. HBA argues the Mitigation Fee Act requires the identification of a specific improvement plan and its attendant costs, not simply a type or category of future public facilities. In other words, the City must use a plan-based approach.

■ Contrary to HBA's position, section 66001 is not so limiting. Rather, it is acceptable for the local agency to identify the facilities via *general* plan requirements. In fact, a "fee" may be "established for a broad class of projects by legislation of general applicability." (§ 66000, subd. (b).) It would

be unreasonable to demand the specificity urged by HBA and require local agencies to make a concrete showing of all projected construction when initially adopting a resolution. Such a resolution might be in effect for decades. (Cf. *Garrick Development Co. v. Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 332.)

█ Moreover, HBA's concern that the standard-based fee "is a spinning turnstile for the collection of money" is unwarranted. Section 66001, subdivisions (c) through (e) require that collected fees be kept segregated from other funds; unexpended funds be accounted for yearly; and if a use for the collected fees cannot be shown, they must be refunded pro rata with interest. (*Garrick Development Co. v. Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 332.) Thus, there is a mechanism in place to guard against unjustified fee retention. (*Ibid.*)

Further, the standard-based method of calculating fees does not prevent there being a reasonable relationship between the fee charged and the burden posed by the development. There is no question that increased population due to new development will place additional burdens on the citywide community and recreation facilities. Thus, to maintain a similar level of service to the population, new facilities will be required. It is logical to not duplicate the existing facilities, but rather, to expand the recreational opportunities. To this end, the City intends to construct an aquatic center, a gymnasium and fitness center, and a naval air museum. Since the facilities are intended for citywide use, it is reasonable to base the fee on the existing ratio of community and recreation facility asset value to population. The fact that specific construction plans are not in place does not render the fee unreasonable. The public improvements are generally identified. The record, here the Colgan Report, need only provide a reasonable basis *overall* for the City's action. (*Garrick Development Co. v. Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 333.)

The community/recreation facility impact fee also meets the identification requirements of the Lemoore City Code. Under section 8-10-3 of the Lemoore City Code, the Mitigation Fee Act controls the adoption of such fees.

HBA additionally argues that the existence of a carryover balance of approximately $1,486,000 in the City's recreation capital impact fee fund invalidates the community/recreation facility impact fee. According to HBA, the failure of the City to credit that carryover balance to the calculation of the new development impact fee causes the resulting fees to be in excess of the reasonable cost of the public facilities for which the fees are imposed; causes the fees to be levied, collected and imposed for general revenue purposes; and fails the reasonable relationship requirement.

However, as explained by Colgan, the development that paid those fees and created the balance is now existing development and those funds must be used to pay for facilities that serve that existing development. Colgan further noted that if, as suggested by HBA, the City were credited with that account balance as existing facilities, the impact fees would be higher. Moreover, under section 66001, subdivision (e), if the carryover balance is not expended on the public improvements for which the fees were collected, the unexpended fees are to be refunded pro rata to the owners of the lots of the development project that paid the fees. Thus, it would be contrary to the statute to credit refunds that are due to existing development to new development.

■ In sum, the City adequately considered all relevant factors and demonstrated a rational connection between those factors and the community/recreation facility impact fee. (*Shapell Industries, Inc. v. Governing Board, supra*, 1 Cal.App.4th at p. 232.) The City's action was not arbitrary, capricious, or entirely lacking in evidentiary support. (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco, supra*, 38 Cal.4th at p. 667.)[2]

b. *The community/recreation facility impact fee is not preempted by the Quimby Act.*

■ Section 66477 (the Quimby Act) permits a city or county to enact an ordinance requiring the dedication of land, or the payment of fees in lieu thereof, for park and recreational purposes as a condition of the approval of a subdivision so long as certain requirements are met. The ordinance must include definite standards for determining the proportion of a subdivision to be dedicated and the amount of any fee to be paid in lieu thereof. However, this dedication or payment cannot "exceed the proportionate amount necessary to provide three acres of park area per 1,000 persons residing within a subdivision subject to this section, unless the amount of existing neighborhood and community park area . . . exceeds that limit, in which case the legislative body may adopt the calculated amount as a higher standard not to exceed five acres per 1,000 persons residing within a subdivision subject to this section." (§ 66477, subd. (a)(2).) Further, "[t]he land, fees, or combination thereof are to be used only for the purpose of developing new or rehabilitating existing *neighborhood or community* park or recreational facilities *to serve the subdivision*." (§ 66477, subd. (a)(3), italics added.) Also,

---

[2] The concurring opinion questions the validity of this community/recreation facility impact fee on the ground that the proposed citywide municipal projects are not adequately related to the specific development project. The concurring justice opines that the relationship between the development and the need for the improvement must be direct to be reasonable. However, HBA did not argue, either in the trial court or on appeal, that this reasonable relationship requirement was not met. Rather, HBA limited its argument to the specificity requirement. Accordingly, we express no opinion on this issue.

"[t]he amount and location of land to be dedicated or the fees to be paid shall bear a reasonable relationship to the use of the park and recreational facilities *by the future inhabitants of the subdivision.*" (§ 66477, subd. (a)(5), italics added.)

HBA contends that, because the community/recreation facility impact fee and the Quimby Act both pertain to "recreation," the Quimby Act preempts the community/recreation facility impact fee. According to HBA, any impact fee imposed on subdivisions for recreational facilities would overlap and duplicate exactions for recreational facilities imposed under the local Quimby Act ordinance, causing builders to pay twice for such recreational facilities.

■ However, the Quimby Act is designed to maintain and preserve open space for the recreational use of the residents of new subdivisions, not the city at large. (*Associated Homebuilders etc., Inc. v. City of Walnut Creek* (1971) 4 Cal.3d 633, 637 [94 Cal.Rptr. 630, 484 P.2d 606].) Accordingly, under this scheme, the park must be in sufficient proximity to the subdivision to serve those future residents. (*Ibid.*) The statute specifically states that the land or fees are to be used for *neighborhood or community* parks or recreation facilities. Although nonsubdivision residents are not excluded, the recreation facilities required by the Quimby Act ordinance are for the new residents whose presence creates the need for additional parkland near the subdivision, as distinguished from a more general or diffuse need for areawide services. (4 Cal.3d at p. 642.)

In contrast, the community/recreation facility impact fees are to be used to build unique facilities intended to serve the entire population of the city. Thus, there is no duplication of fees. Rather, the Quimby Act fees and the community/recreation facility impact fees pertain to entirely separate categories of "recreation."

■ Moreover, the Mitigation Fee Act authorizes fees for recreational facilities independent of the Quimby Act. Quimby Act fees are expressly excluded from the fees authorized to be collected under the Mitigation Fee Act. (§ 66000, subd. (b).) Nevertheless, the Mitigation Fee Act permits fees to be adopted for "[p]arks and recreation facilities." (§ 66002, subd. (c)(7).)

In sum, the community/recreation facility impact fees address needs other than "neighborhood or community park or recreational facilities to serve the subdivision." Accordingly, those fees are not preempted by the Quimby Act.

4. *Parkland Impact Fee.*

The City adopted two separate parkland impact fee resolutions. Resolution No. 2007-04 set fees in lieu of parkland dedication under the Quimby Act.

Resolution No. 2006-46 set such fees for residential development not involving a subdivision of land, i.e., development not subject to the Quimby Act.

HBA contends the resolution No. 2007-04 parkland impact fee is invalid for three reasons. According to HBA, this impact fee is preempted by the Quimby Act, is calculated using the invalid "standard-based method," and is inconsistent with the City's general plan. In support of the first two reasons, HBA merely references its arguments regarding the community/recreation facility impact fee. However, this parkland impact fee cannot be preempted by the Quimby Act because it was adopted pursuant to that act. If HBA meant this argument to pertain to resolution No. 2006-46 parkland fees, it is also without merit because those fees are expressly limited to residential development outside of the Quimby Act. HBA's contention that the fees are invalid due to the use of the standard-based calculation method is also unavailing for the reasons stated above.

> *The parkland impact fee standard is not inconsistent with the City's general plan.*

The Quimby Act provides that the dedication of land, or the payment of fees, or both, shall not exceed the proportionate amount necessary to provide three acres of park per 1,000 residents of the subdivision. However, if the amount of existing neighborhood and community park area exceeds that limit, the legislative body may adopt the calculated amount as a higher standard not to exceed five acres per 1,000 residents. (§ 66477, subd. (a)(2).)

The Colgan Report calculated the ratio of existing park acreage to population as exceeding five acres per 1,000 persons. Accordingly, the City adopted the five-acre standard as authorized by the Quimby Act.

HBA argues that this standard of five acres per 1,000 residents is inconsistent with the City's general plan. The 1990 general plan, relied on by HBA, established a standard of three acres as the basis for requiring land dedications and/or fees as authorized by the state Subdivision Map Act (§ 66410 et seq.).

In enacting the parkland fee ordinance and resolutions, the City concluded that the standard of five acres per 1,000 residents was consistent with the City's general plan. This conclusion carries a strong presumption of regularity that can only be overcome by a showing of abuse of discretion. (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816 [65 Cal.Rptr.3d 251].) " 'An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence.' " (*Ibid.*) Appellate review is highly deferential to the local agency, " 'recognizing that "the body which adopted the general plan policies in its

legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.]" ' " (*Ibid.*)

■ An action is consistent with the general plan if, considering all of its aspects, it will further the objectives and policies of the general plan. (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994 [21 Cal.Rptr.2d 803].) State law does not require perfect conformity between the action and the general plan. (*Friends of Lagoon Valley v. City of Vacaville, supra,* 154 Cal.App.4th at p. 817.) Rather, to be consistent, the action simply must be compatible with the objectives, policies, general land uses and programs specified in the general plan. (*Ibid.*)

Here, the City's general plan reflects the City's commitment as a matter of policy and priority to parks and recreation for its citizens. The plan proposes the acreage standards as "policies" and expressly recognizes that circumstances could change. The reference to the acreage standard being as authorized by the Subdivision Map Act indicates that the general plan was intended to be consistent with that act.

Under these circumstances, it must be concluded that the City did not abuse its discretion in finding that the five-acre standard was not inconsistent with the general plan. The general plan references the Subdivision Map Act, which authorizes the five-acre standard in section 66477, i.e., the Quimby Act. This is an officially approved statewide goal that the Legislature intended the City to be guided by in its planning process. (§ 65030.1.) Moreover, this standard furthers the objectives and policies of the general plan to promote access to parks and recreation. In sum, the five-acre standard is compatible with the general plan.

5. *Police Impact Fee (Resolution No. 2006-46).*

The City adopted the police impact fee to maintain its current level of service for police facilities, vehicles, and equipment as the city grows. The Colgan Report calculated the impact fees based on the cost of maintaining existing ratios of facilities, vehicles, and officer safety equipment to calls for service. Colgan used a random sample of all calls logged for 2005 classified by development type, i.e., single-family residential, multifamily residential, etc., and the number of existing units per development type to arrive at the average police calls per existing unit of development type. Colgan then used the estimated replacement cost of existing facilities and assets divided by the total number of service calls to arrive at an average cost per call. To arrive at the capital cost per unit of development type, Colgan multiplied the calls per unit of development type times the cost per call. The Colgan Report also found that the existing police headquarters building was nearing capacity and additional space would be needed to accommodate the city's growth.

HBA again objects to the City's use of a standard-based method to arrive at the impact fee. According to HBA, this standard has no nexus to new housing that pays the fees and fails to identify public facilities required to serve new development. HBA additionally argues that the standard improperly includes operational expenses that are not "public facilities" such as radios, weapons, protective clothing, and vehicles.

Contrary to HBA's position, the Colgan Report provides a reasonable basis overall for the police impact fee. There is no question that increased population due to new development will place additional demands on the police department. To maintain the current level of service, the department will need to be expanded. Since the fee calculation standard classifies the cost of service by development type, there is a nexus between the development that pays the fee and the burden on the police department caused by that development.

HBA's objection to the fee calculation including the capital cost of police vehicles and equipment is also without merit. Section 66000, subdivision (d), defines "public facilities" as including public improvements and public services. Vehicles and officer safety equipment are necessary to provide the public service of police protection. The fees are to be used for the initial capital costs of these items, not for the costs of operation and maintenance.

Finally, the public facilities to be financed by the police impact fees are adequately identified. The Colgan Report refers to expanding the current headquarters, constructing a substation, and adding the necessary police vehicles and officer safety equipment.

In sum, the police impact fee is valid. The City adequately considered all relevant factors and demonstrated a rational connection between those factors and the fee. (*Shapell Industries, Inc. v. Governing Board, supra*, 1 Cal.App.4th at p. 232.)

6. *Municipal Facilities Impact Fee (Resolution No. 2006-49).*

The City adopted the municipal facilities impact fee to maintain the city's existing level of service for municipal facilities, vehicles and equipment as the city grows. To calculate this fee, Colgan valued the existing municipal facilities, vehicles and equipment and calculated a per capita cost based on the current relationship between municipal facility costs and functional population.

As with the community/recreation facility impact fee and the police impact fee, HBA objects to the City's use of a standard-based method to

arrive at this fee. According to HBA, this standard has no nexus to new housing that pays the fees and fails to identify public facilities required to serve new development.

Contrary to HBA's position, the Colgan Report provides a reasonable basis overall for the municipal facilities impact fee. Increased population due to new development will place additional demands on the existing complement of municipal facilities, vehicles and equipment. To maintain the current level of service, this complement will inevitably need to be expanded. Colgan noted that some city services are impacted only indirectly by residential development and thus allocated costs between residential and nonresidential development. This specific allocation of costs among different types of development provides a nexus between the development that pays the fee and the burden on municipal facilities posed by that development.

The Colgan Report acknowledges that specific plans for future municipal facilities and equipment are not currently available. The report further notes that "[t]he existing municipal complex contains large areas that are currently unfinished and unused. It is likely that some of the City's future space needs will be accommodated by finishing additional space in that building, which currently houses offices, maintenance facilities, and storage. Other space may be acquired or developed downtown."

Nevertheless, as discussed above, it is acceptable for the local agency to identify the facilities via general plan requirements. Moreover, contrary to HBA's position, Colgan considered the capacity of the existing facilities noting that such areas could be finished to provide for future municipal needs. Further, the section 66001, subdivisions (c) through (e) requirements that the collected fees be segregated, accounted for yearly, and refunded if a use cannot be shown guard against unjustified fee retention. (*Garrick Development Co. v. Hayward Unified School Dist., supra*, 3 Cal.App.4th at p. 332.)

The City adequately considered all relevant factors and demonstrated a rational connection between those factors and the municipal facilities impact fee. (*Shapell Industries, Inc. v. Governing Board, supra*, 1 Cal.App.4th at p. 232.) The City's action was not arbitrary, capricious, or entirely lacking in evidentiary support. (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco, supra*, 38 Cal.4th at p. 667.) Accordingly, this fee is valid.

7. *Fire Protection Impact Fee (Resolution No. 2006-49).*

For purposes of calculating fire protection impact fees, the Colgan Report divided the city into two service areas, the older, established east side and the newer west side. Regarding the east side, the Colgan Report states that "the facilities and equipment needed to serve future development are already in place, so impact fees for that area are intended to recover new development's

proportionate share of the cost of the fire protection assets serving the area. The revenue from those fees will be used to offset a portion of the City's recent investments in facility improvements and new equipment, which were funded in part with general fund money." In contrast, the west side will need a new fire station and equipment to serve that area as it develops.

a. *The east side impact fees are invalid.*

As discussed above, the Mitigation Fee Act requires the local agency to determine that the amount of the fee and the need for the public facility are reasonably related to the burden created by the development project. Further, the local agency must identify the facilities to be financed by the fee.

HBA objects to the east side fees on the ground that they are being imposed for general revenue purposes. Since there is no need for additional fire protection facilities in that part of the city to serve new development, HBA contends that no nexus exists between the fees and the burden posed by new housing.

HBA is correct. While a fee may be imposed to cover costs attributable to increased demand for public facilities reasonably related to the development project in order to (1) refurbish existing facilities to maintain the existing level of service or (2) achieve an adopted level of service that is consistent with the general plan (§ 66001, subd. (g)), the existing east side fire protection facilities are already adequate to continue to provide the same level of service. In other words, the new development will not burden the current facilities. The Colgan Report's proposal to reimburse the City for its prior general fund money investments is not authorized by the Mitigation Fee Act. Rather, such a fee would constitute general revenue to the City in violation of section 66008, and therefore is invalid.

b. *The west side impact fees are valid.*

The Colgan Report concludes that, due to the barrier created by Highway 41 between the east side and the west side of the city, a new fire station will be required to serve the west side as it develops. In calculating the cost per capita for the west side, Colgan included the forecasted population of a 476-acre area that may be annexed to the city in the future. This addition resulted in reducing the west side fire protection impact fees by approximately 28 percent.

HBA objects to the calculation including this potential annexation area as opposed to using the existing legal boundaries of the city. HBA posits that a new fire station might not be needed if the hypothetical annexation does not occur.

Contrary to HBA's position, the Colgan Report provides a reasonable basis for the City's adoption of the west side impact fee. There is no indication

that, without the potential annexation, additional fire protection facilities would be unnecessary to serve new development. Rather, it can be inferred from the relatively low percentage of fee reduction, i.e., 28 percent, that fire protection facilities would be required with or without the annexation. The City considered the potential population to be served for the purpose of reducing the fee that would otherwise be charged and spreading the costs more equitably. This action was not arbitrary or capricious.

8. *Refuse Vehicle and Container Impact Fees (Resolution No. 2006-46).*

To calculate the refuse vehicle impact fees for single-family residences, Colgan used the existing relationship between the number of side-loading trucks and the number of dwelling units in the city. These fees are intended to provide for additional vehicles as the number of customers increases. The analysis assumes the need for additional vehicles will increase in proportion to the number of additional dwelling units. The impact fee calculated for refuse containers is based on the cost of the three containers provided to each new single-family residence.

HBA contends this standard improperly includes operational expenses in violation of section 65913.8. According to HBA, the refuse containers and rapidly depreciating refuse vehicles are not public facilities that may be funded by development impact fees. Rather, HBA argues, the containers and replacement vehicles should be paid for by the monthly garbage collection service fees.

Section 66000, subdivision (d), defines "public facilities" as including public improvements and public services. Refuse vehicles and containers are necessary to provide the public service of garbage collection. The fees are to be used for the initial capital costs of these items, not for the costs of operation and maintenance. Accordingly, these fees are valid.

9. *City's collection and administration practices comply with the Mitigation Fee Act.*

Fees collected under the Mitigation Fee Act must be administered pursuant to the act's statutory requirements. In general, the local agency must deposit the fee collected "with the other fees for the improvement in a separate capital facilities account or fund in a manner to avoid any commingling of the fees with other revenues and funds of the local agency . . . ." (§ 66006, subd. (a).) Thereafter, within 180 days of the end of each fiscal year, the local agency must provide certain information to the public for each

separate account or fund. This information includes a brief description of the type of fee; the amount of the fee; the beginning and ending balance; the amount of the fees collected and interest earned; an identification of each public improvement on which fees were expended and the amount of the expenditures on each improvement; and an approximate date by which the construction of the public improvement will commence if the local agency determines that sufficient funds have been collected. (§ 66006, subd. (b).)

■■■ A fee may be established for a broad class of projects by legislation of general applicability or be imposed on a specific project on an ad hoc basis. (§ 66000, subd. (b).) At the time the local agency imposes a fee for public improvements on a specific development project, it must identify the public improvement that the fee will be used to finance (§ 66006, subd. (f)) and must expend the fee solely and exclusively for the purpose or purposes so identified (§ 66008).

HBA objects to the City's administration of the development fees on the ground that the City did not adequately identify the public facilities and improvements to be financed as part of enacting the fee resolutions. HBA further argues that the City's annual reporting does not identify each public improvement on which funds were expended and does not show the total percentage of the cost of public improvement that was funded by fees as required by section 66006, subdivision (b)(1)(E). HBA additionally contends that, when the City imposes and collects a fee payment, it does not identify the public improvements that the fee will be used to finance in violation of section 66006, subdivision (f).

As discussed above, the City adequately identified the public facilities and improvements when it enacted the development impact fees.

Further, the City's annual reporting meets the statutory requirements. HBA objects to the City segregating the funds by facility category, rather than by a specifically identified project. However, fees may be established, as they were here, for a broad class of projects as opposed to a specific improvement. (§ 66000, subd. (b).) Moreover, under section 66006, subdivision (a), all that is required is that the fees be deposited into "a separate capital facilities account" to avoid commingling with the local agency's other revenues and funds. Further, contrary to HBA's position, the City's annual accountings for fiscal year 2006–2007 do identify the specific projects on which the fees were expended and the percentage of the cost that was funded by the fees in compliance with section 66006, subdivision (b).

HBA's claim that the City violated section 66006, subdivision (f), is also without merit. That section pertains to imposition of "a fee for public

improvements on a *specific development project*." (Italics added.) As noted by the trial court, HBA has neither alleged nor shown that a development fee has been imposed directly on it or one of its members. Accordingly, section 66006, subdivision (f), cannot provide HBA with a basis for relief.

## DISPOSITION

The portion of the judgment upholding the fire protection impact fee for the east side of the City is reversed. In all other respects, the judgment is affirmed. Each party will bear its own costs on appeal.

Dawson, J., concurred.

**ARDAIZ, P. J.,** Concurring.—I concur in the result. I write separately to express my view regarding the assessment of a community/recreation facility impact fee. In the instant case, the City of Lemoore imposed a fee pursuant to Government Code section 66000 et seq., regarding a category of desired potential municipal improvements *such as* a municipal aquatic center, a municipal gymnasium and fitness center and a naval air museum. Appellant objects that the specific facility is not clearly identified and therefore complains that it must be specifically identified. As noted in the majority opinion "reference was made to examples of future facilities without any actual plan or commitment." (Maj. opn., *ante,* at p. 564.)

I agree with the majority that a class of projects may be identified as opposed to a specific project. However, that resolution does not address my concern regarding the nature of the class of projects in terms of relationship to the specific development. Government Code section 66000 specifically provides within its definition of a "fee" that it is a monetary exaction "imposed on a specific project on an ad hoc basis, that is charged by a local agency to the applicant in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities *related to the development project* . . . ." (§ 66000, subd. (b), italics added.)

Government Code section 66001 addresses the duties of the local agency in regard to the fee and provides in pertinent part, "Determine how there is a *reasonable relationship* between the fee's use and the type of development project on which the fee is imposed." (§ 66001, subd. (a)(3), italics added.)

Specifically, my concern is the category of municipal improvements designated as justification for the fee in question. Using general rules of construction, there are two that have bearing here. *Noscitur a sociis*, it is known from its associates, means that a word may be defined by an accompanying word. *Ejusdem generis*, of the same kind, means that general words are construed to

embrace only objects similar in nature to those objects enumerated by the specific word. (2A Singer & Singer, Sutherland Statutes and Statutory Construction (2007 new ed.) §§ 47:16 to 47:17.) In the context of this case, I would conclude that the specific facilities identified such as a municipal aquatic center and a naval air museum identify the class of projects referred to. Or, to be specific, the class of projects referred to would be reasonably identified as communitywide projects, which is precisely how they were described.

This brings me to the specific concern that I raise. Government Code sections 66000 and 66001 refer to a fee related to the development project. The term "related" would in its normal usage mean associated with or having a close connection to. (Webster's New World Dict. (2d college ed. 1982) p. 1198.) I would infer from this that the proposed specific project or class of projects must be a consequence of or have a direct relationship to the proposed development.

I have no argument that the proposed class of municipal projects herein is not desirable or beneficial. However, I have great difficulty concluding that their desirability or need are a consequence of or have a direct relationship to the proposed project herein. That a community may be desirous of celebrating its military heritage is laudable. However, it is a community benefit that springs from an expression of the nature of the community atmosphere and culture. Likewise, an aquatic center is a desirable and useful thing but it is difficult to infer how its need springs from the project herein.

Clearly as population expands or shifts, more and different infrastructure facilities are required. New population centers require building new elementary schools and new roads, etc. However, there is a significant difference between building a new elementary school or a new high school that may service more than just the development and a facility that services the entire community. That a community grows and the nature of the population changes relates to policy decisions that fall upon the entire community as opposed to one aspect of the community. In other words, the fact that a new development may increase traffic on a central roadway does not mean that the new development should be responsible for building a freeway. Such responsibilities should fall equally within the community, and in my view to link it to a specific development is a tenuous thread. Utilizing that type of reasoning justifies a development fee for almost anything and I do not glean that type of result from the words of this statute.

Appellant argues, as it did before the trial court, that failure to identify a specific project violates the provision of Government Code section 66001, subdivision (a)(2) that the "facilities shall be identified," likewise the provisions of Government Code section 66006, subdivision (b)(1)(E) requiring

"[a]n identification of each public improvement" as well as related statutes with similar language. While I do not read the statute so narrowly, I would contend that the failure to identify a specific project could deprive the developer of any reasonable ability to determine if the specific project is reasonably related to the proposed fee. On the other hand, a listing of projects that clearly would relate to the development such as increased sewage, schools, water, et cetera, does define projects that on the surface do bear a reasonable relationship to the normal infrastructure facilities generated by a new development.

The impact of allowing general community municipal improvements without any realistic showing as to how they bear a direct or reasonable relationship to the proposed development raises serious issues as to whether the statute herein does justify the fees imposed for the proposed improvements. I do not accept that simply concluding a particular general municipal improvement benefits the community as a whole and necessarily a specific development within that community somehow supports the conclusion that it is related to a specific development.

The majority concludes by footnote that the specific nature of the facility was not argued as opposed to the contention that the specific identity of the project must be specified, in other words, that the specific issue was not preserved for appeal. (See maj. opn., *ante*, at p. 566, fn. 2.) In my view the issue is at best ambiguous as to whether the general argument subsumes the specific but I do agree that the specific argument directed toward my concern was not raised. I write separately to ensure no implication that inferentially I accept the conclusion that the projects indicated herein are justified under the statute. In my view, absent some showing of a more direct and specific relationship between the municipal improvement and the proposed development, such fees are seriously subject to question.

Petitions for a rehearing were denied July 8, 2010, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 22, 2010, S184580. Baxter, J., did not participate therein.