Filed 4/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| TANIMURA & ANTLE FRESH FOODS, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SALINAS UNION HIGH SCHOOL DISTRICT, <br><br> Defendant and Appellant. | H045470 <br> (Monterey County <br> Super. Ct. No. 16CV000616) |

  In this appeal we consider whether a school district acted reasonably in imposing school impact fees on a new residential development project intended to house adult seasonal farmworkers employed by the company. The trial court found that there was no reasonable relationship between the fee and the project's impact on school enrollment and so granted the developer's petition for writ of mandate to refund the fees. The school district contends this was error because the authorizing statute does not require that school districts anticipate and analyze specific use cases for subtypes of residential housing, e.g., adult employees only. Rather, the law requires a reasonable relationship between the fee's use, the need for the school facilities, and the *type* of development project—in this case, residential. The district also contends that the potentially discriminatory exclusion of children from a new residential development should not form an escape hatch for the developer to avoid paying mitigation fees under the statute.

  We find, as explained herein, that the statutes governing the imposition of school impact fees do not require a school district to separately analyze the impact of a unique subtype of residential construction not contemplated in the statute. To hold otherwise

would disrupt the school district's quasi-legislative authority to impose prospective, districtwide fees based upon development type. In this case, the school district properly determined a reasonable relationship between the fee imposed and new residential construction as the type of development. We conclude that it did not act arbitrarily in imposing the resulting fee on the agricultural employee housing project. We will therefore reverse the judgment.

## I. BACKGROUND

This case is situated at the intersection of two statutes. One is the Mitigation Fee Act, codified as Government Code sections 66000 through 66003.[1] This statute requires local agencies seeking to impose fees on private developers as a condition of approval of a development project to determine how there is a "reasonable relationship" between the type of development project, the fee's use, and the need for the public facilities. (§§ 66000, subd. (b), 66001, subd. (a)(3) & (4).)

The other statute comprises detailed legislation governing the imposition of school impact fees on private development projects. (Ed. Code, § 17620; Gov. Code, §§ 65995, 65995.5, 65995.7.) The Legislature has declared the financing of school facilities and the mitigation of development-related impacts on the need for school facilities to be "matters of statewide concern." (§ 65995, subd. (e).) State statute authorizes a school district to levy fees on new construction in its service area for school facilities to accommodate a growing student population. To impose a school impact fee, a school district must determine the reasonable relationship required under the Mitigation Fee Act.

### A. *The Agricultural Employee Housing Project*

Tanimura & Antle Fresh Foods, Inc. (T&A), is the developer of a 100-unit agricultural employee housing complex (the project) located within the boundaries of the

---

[1] Unspecified statutory references are to the Government Code.

2

Salinas Union High School District (the District) in Monterey County.[2]  T&A designed the project to accommodate between 200 and 800 of the company's seasonal and migrant farmworker employees in two-bedroom, dormitory-like apartment units during the approximately seven-month Salinas Valley growing season.  The project description stated that it was designed for " 'agricultural employees only, without dependents.' "  In May 2015, T&A applied to the County of Monterey for a combined development permit for the project.  A report prepared for the county board of supervisors found that the project "for employees without dependents" would "not have an adverse impact on schools."

The county board of supervisors approved the project in September 2015.  The board issued a resolution to adopt a mitigated negative declaration under CEQA[3] and to approve a combined development permit consisting of a general development plan, administrative permit, and design approval "to allow the construction of a 100 unit agricultural employee housing complex comprised of two bedroom apartment units and related facilities . . . ."  The project was approved subject to enumerated conditions, which in relevant part described the development for "agricultural employees only without dependents" and advised that any use "not in substantial conformance with the terms and conditions of this permit" would violate county regulations and require the approval of additional permits, including an amendment to the general development plan.  As a condition of project approval, T&A executed an agreement with the county specifying in relevant part the developer's obligation to comply with the conditions of

_____

[2] The factual background is drawn from the evidence admitted at trial.  We take judicial notice of those matters properly noticed by the superior court as set forth in its intended statement of decision filed on September 8, 2017.  (Evid. Code, § 459, subd. (a).)

[3] California Environmental Quality Act (Pub. Res. Code, § 21050 et seq.).

3

approval. The agreement was recorded in the county recorder's office on September 3, 2015, to be construed as a covenant running with the land.

### B. *Adoption of School Impact Fees*

Around the same time that T&A applied for project approval, the governing board of the District adopted a "Level 2" school impact fee on new residential construction in its service area. A Level 2 fee requires the school district to demonstrate need based on statutory prerequisites.[4] (§ 65995.5, subd. (b).) Here, the District's consultant prepared a school facilities needs analysis (SFNA or needs analysis) under the statutory guidelines and concluded that the District was authorized to collect Level 2 fees of $3 per square foot of residential development, based on a projection of the residential units to be built in the district over five years. The District voted to adopt the SFNA and to establish the Level 2 fee on residential construction within the grade 7 through 12 service area of the District for the 2015-2016 fiscal year.

The parties disputed the applicability of the Level 2 fee to the project. T&A eventually tendered the fee amount of $294,210 to the District under protest. (§ 66020, subd. (a) [procedures to protest imposition of fees].)

### C. *Petition for Writ of Mandate and Court Trial*

T&A filed a petition for writ of mandate in the Monterey County Superior Court seeking declaratory relief and a refund of the fee paid, plus interest. T&A challenged the Level 2 fee under section 66001 as not reasonably related to the need for school facilities. It stressed that the project's design and approval for agricultural employees only, without dependents, meant that it would not generate new students for the district. Since the

---

[4] There are several alternative statutory formulas that dictate the maximum fee a school district can impose for each square foot of new construction. (§§ 65995, 65995.5, 65995.7.) These are commonly known as Level 1, Level 2, and Level 3 fees. (*Cresta Bella, LP v. Poway Unified School Dist.* (2013) 218 Cal.App.4th 438, 443 (*Cresta Bella*).)

4

employees-only designation was among the conditions recorded on title, T&A argued that the project was "not the typical type of residential project" covered by the District's needs analysis.

In support of its position that the project would not impact local schools, T&A filed the declaration of vice president Wesley Van Camp. Van Camp, charged with managing the planning, permitting, construction, and occupancy of the agricultural employee housing project, declared that the "vast majority" of T&A's seasonal/migrant farmworker employees "have families and permanent homes outside of Monterey County." Van Camp explained that employees leave their children at home when they come to work for T&A during the Salinas Valley growing season, from April through the end of October, and sometimes both parents come to work for T&A and leave children at home with other relatives. T&A also filed the excerpted deposition testimony of Kevin Sullivan, the designated PMK (person most knowledgeable) for the consulting firm that performed the District's SFNA, to show that the student generation rate analysis for the SFNA did not consider any kind of residential development that does not allow children.

The District responded that the reasonable relationship requirement applies to the *type* of development project on which the fee is imposed, not to a specific development. School districts otherwise would have "to somehow anticipate and separately analyze . . . every conceivable variation of residential development that might be proposed, including even legally questionable permutations, during the year-long life-span of a district's developer fee." The District argued that school districts are not required to anticipate alternate housing types or to determine whether a project actually generates enrollment at the rate anticipated by the needs analysis. The District pointed to express statutory exemptions for government-financed migrant worker housing (§ 65995.1, subd. (b)) as support for the argument that nonexempt housing types are included within the general class of residential development.

5

The District also contended based in part on a passage in the board's resolution and on the deposition testimony of the county's resource manager that the "adult employees only" designation was not a condition of the project. According to the District, the county recognized the potentially discriminatory ramification of excluding children and so determined that T&A would submit the occupancy limitation in its project description, which the county would merely approve. T&A objected to the District's references to housing discrimination and to its proffer of related evidence as irrelevant and inadmissible.

At a bench trial, counsel for T&A clarified that it was not challenging the District's needs analysis generally, but only the reasonable relationship between the fee "and this particular type of project." Counsel for the District countered that unlike a project's physical composition, a property owner's intent for use of the property does not create a different "type" or class of development, especially when that intent may be unlawful. The District urged the court to consider the evidence of the county's "uncomfortable solution" for approving the project and argued that if families were later allowed to live there, the District would have no clear legal authority or statutory mechanism to recover appropriate school impact fees.

### D. *Order Granting Peremptory Writ of Mandate to Refund Fees*

The trial court entered an intended statement of decision in favor of T&A. The court cited three Court of Appeal decisions that led "to the inescapable conclusion that . . . there are no facts to support a reasonable relationship between the fees and the project's impact on school enrollment." The decisions are *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218 (*Shapell*), *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840 (*Warmington*), and *Cresta Bella, supra*, 218 Cal.App.4th 438.

The trial court reasoned that although section 66001, subdivision (a) directs a school district to determine the required reasonable relationship based on "type" of

6

development, "case law—and common sense—preclude the application of an overbroad label in a fee study that does not account for a project's actual impact." The court explained that the SFNA "lumped all residential development into one category of 'residential construction' without taking into account that no children would live in this type of development." It sustained T&A's objections to the evidence related to housing discrimination, finding it was not relevant, and interpreted the conditions of approval as showing "that the County's approval prohibit[ed] occupation of the housing project by anyone other than adult employees."

After additional briefing by the parties, the trial court issued a minute order stating that it had not modified its intended statement of decision which became the final statement of decision. The court issued a final order and judgment and peremptory writ of mandamus on November 8, 2017. This appeal followed.

## II.    DISCUSSION

The District, supported by amici curiae briefs from the Coalition for Adequate School Housing and Education Legal Alliance of the California School Boards Association, contends that if the trial court's ruling is upheld, it will have wide-ranging implications for school funding. They claim that to avoid paying school impact fees, developers can characterize projects as a different "type" than that covered by the fee analysis, for which a fee has been established. T&A responds that to impose fees on a project that does not burden schools is contrary to the reasonable relationship requirement, which evolved as a principle of takings law to protect landowners and private developers from fees imposed as a condition of development that bear little or no relationship to the impact on public facilities. (See *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 860 (*Erlich*) [examining application of the " 'essential nexus' " and " 'rough proportionality' " requirements set forth in *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 and *Dolan v. City of Tigard* (1994) 512 U.S. 374 to development fees as a permit condition].)

7

### A.   Statutory Framework

School impact fees emerged as a way for local governments to accommodate growing student populations perpetuated by new development.  (*Shapell*, *supra*, 1 Cal.App.4th at pp. 225-226.)  Fees imposed on developers to cover the costs of new school facilities "were generally considered to be a valid exercise of the police power under the California Constitution (Cal. Const. art. XI, § 7), so long as the local entity could demonstrate a reasonable relationship between the fee imposed and the need for increased facilities created by the development."  (*Shapell*, *supra*, at p. 226; see also *Grupe Development Co*. *v*. *Superior Court* (1993) 4 Cal.4th 911, 917 (*Grupe*).)

In 1986, the Legislature "substantially revised and expanded" early statutory authorization for school impact fees imposed by local government.  (*Shapell*, *supra*, 1 Cal.App.4th at p. 226.)  It established what it declared was "a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district."  (Stats. 1986, ch. 887, § 7(e), p. 3080.)  The "comprehensive multibill package . . . consolidated the legal authority for assessment of developer fees for school facilities into a single body of law."  (*Shapell*, *supra*, at p. 226.)  The provisions enabled school districts to impose districtwide fees within specified limits and restricted the issuance of building permits absent certification that the appropriate school impact fee had been paid.  (*Ibid*., citing former Gov. Code, § 53080.)[5]

Education Code section 17620 authorizes a school district governing board to levy fees against construction within the boundaries of the district to fund the construction or reconstruction of school facilities, subject to the limitations set forth in Government Code

---

[5] Later legislative enactments repealed Government Code section 53080 et seq. and effectively replaced it with provisions added to the Education Code.  (See Stats. 1996, ch. 277, § 3, p. 2180 [adding Ed. Code, § 17620], §§ 7-14, p. 2219 [repealing Gov. Code § 53080 et seq.], § 15, p. 2219 [stating that the provisions added are substantially the same as existing provisions relating to the same subject matter].)

section 65995 et seq. The authorization applies to "new residential construction" (Ed. Code, § 17620, subd. (a)(1)(B)) and, with exceptions, to "new commercial and industrial construction" (*id*., § 17620, subd. (a)(1)(A)). The relevant Government Code provisions cap the amount of the fee that may be imposed per square foot of new residential construction based upon the criteria met by the school district. (§§ 65995, 65995.5, 65995.7.) Level 2 fees, at issue here, come under section 65995.5.

"Section 65995.5 provides for a Level 2 fee that may be used when the school district meets certain statutorily specified criteria that show a particular need for additional funds for school construction." (*Cresta Bella*, *supra*, 218 Cal.App.4th at pp. 445-446.) To be eligible to adopt a Level 2 fee, the school district must "[c]onduct and adopt a school facility needs analysis pursuant to Section 65995.6." (§ 65995.5, subd. (b)(2).) The SFNA is designed "to determine the need for new school facilities for unhoused pupils that are attributable to projected enrollment growth from the development of new residential units over the next five years."[6] (§ 65995.6, subd. (a).) The projection is "based on the historical student generation rates of new residential units constructed during the previous five years *that are of a similar type of unit to those anticipated to be constructed* . . . , and relevant planning agency information, such as multiphased development projects, that may modify the historical figures." (§ 65995.6, subd. (a), italics added.) The school district calculates the maximum Level 2 fee that may be imposed per square foot of residential construction using a statutory formula; the fee ultimately "reflects only a *portion* of the estimated new facilities costs generated" by the projection in the needs analysis. (*Cresta Bella*, *supra*, at p. 446; see § 65995.5, subds. (c), (h).)

---

[6] " 'Unhoused pupils' " are students who lack seats in existing school facilities. (*Cresta Bella*, *supra*, 218 Cal.App.4th at p. 446, fn. 4.)

The statute limits the expenditure of Level 2 fees to "solely . . . the school facilities identified in the needs analysis as being attributable to projected enrollment growth from the construction of new residential units." (§ 65995.5, subd. (f).) This restriction mirrors in part the broader reasonable relationship requirement for developer fees under the Mitigation Fee Act.

The Mitigation Fee Act applies to a monetary exaction imposed by a local agency as a condition of approval of a development project to defray public facility costs related to the project. (§ 66000, subd. (b); *Ehrlich*, *supra*, 12 Cal.4th at p. 865.) It "was passed by the Legislature 'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.' " (*Ehrlich*, *supra*, at p. 864.) Section 66001 requires the local agency to identify the purpose of the fee and the use to which the fee will be put. (§ 66001, subd. (a)(1), (2).) The agency must also determine that both "the fee's use" (§ 66001, subd. (a)(3)) and "the need for the public facility" are reasonably related to "the type of development project on which the fee is imposed." (*Id*., subd. (a)(4).)

The court in *Shapell* invoked a three-part standard to determine compliance with the nexus requirement in the context of school impact fees. (*Shapell*, *supra*, 1 Cal.App.4th at p. 235.) The school district must show that it (1) projected the total amount of new housing expected to be built within the district, (2) estimated how many students will be generated by the new housing, and (3) estimated what it will cost to provide the necessary school facilities for that approximate number of new students. (*Ibid*.) For a general fee applied to all new residential development, a site-specific showing is neither available nor needed. (*Garrick Development Co. v. Hayward Unified School Dist*. (1992) 3 Cal.App.4th 320, 334 (*Garrick*).) Instead, "[t]his showing may properly be derived from districtwide estimations concerning anticipated new residential development and impact on school facilities. [Citations.] The district is not required to evaluate the impact of a *particular* development project before imposing fees on a

10

developer; rather, the required nexus is established based on the justifiable imposition of fees 'on a *class* of development projects rather than particular ones.' " (*Cresta Bella*, *supra*, 218 Cal.App.4th at p. 447, quoting *Garrick*, *supra*, at p. 335.)

### B.    *Standard of Review and Burden of Proof*

The District's establishment of the Level 2 fee on new residential development was a quasi-legislative action. (*SummerHill Winchester LLC v. Campbell Union School Dist.* (2018) 30 Cal.App.5th 545, 552 (*SummerHill*).) Judicial review of the District's action proceeds "under the narrower standards of ordinary mandate." (*Home Builders Assn. of Tulare/Kings Counties*, *Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 561 (*Home Builders*); *SummerHill*, *supra*, at p. 552.) This limited review recognizes the legislative delegation of authority to the District and its presumed expertise within its scope of authority. (*Shapell*, *supra*, 1 Cal.App.4th at p. 230; *Garrick*, *supra*, 3 Cal.App.4th at p. 328.) We determine only whether the District's action was arbitrary, capricious, or entirely lacking in evidentiary support. (*Home Builders*, *supra*, at p. 561; *SummerHill*, *supra*, at p. 674; *Garrick*, *supra*, at p. 328.) We proceed as a matter of law and accord no deference to the trial court's decision. (*SummerHill*, *supra*, at p. 675; *Shapell*, *supra*, at p. 233.)

A school district establishing a school impact fee "has the initial burden of producing evidence sufficient to demonstrate that it used a valid method for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development." (*Home Builders*, *supra*, 185 Cal.App.4th at p. 561.) If the district meets its burden, the developer challenging the fee must "show that the record before the local agency clearly did not support the underlying determinations regarding the reasonableness of the relationship between the fee and the development." (*Ibid.*; accord *Cresta Bella*, *supra*, 218 Cal.App.4th at p. 451.) We will therefore uphold the imposition of the Level 2 fee on T&A's project if the District adequately considered all relevant factors and demonstrated a rational connection

11

between those factors, the decision to enact the fee, and the purposes of the enabling statute. (*Home Builders*, *supra*, at p. 561; *SummerHill*, *supra*, 30 Cal.App.5th at pp. 674-675.)

## C. *Analysis*

The District frames the question on appeal by asking whether a real estate developer can "avoid paying school impact fees by professing an intention to employ the potentially illegal tactic of excluding families from a new residential development?" It challenges T&A's characterization of the project "as a 'unique sub-type of migrant farmworker employee housing,' " arguing there is no statutory authority for a developer to "create a separate 'type' of residential development by merely declaring an intention to exclude families." Amici curiae supporting the District further argue that the trial court's ruling improperly creates a de facto, nonstatutory exemption for atypical housing projects that fall outside the range of project data covered by the school district's fee analysis.

T&A responds that imposition of the Level 2 fee on the project in this case was arbitrary and lacked evidentiary support because any nexus between the fee and the school facilities necessitated by residential development in the district did not extend to T&A's agricultural employees-only project, which it argues was not a type of residential development analyzed by the District's needs analysis. T&A disagrees that the developer's intent or any evidence related to a discrimination argument is relevant, since the condition pertaining to adult employees only is specified in the county's approval of the project and is recorded on title as part of the development plan.

### 1. *Developer "Intent" Does Not Drive the Determination of Project "Type"*

We dispel the notion that T&A's *intent* not to house children in the proposed project dominates the reasonable relationship analysis. The premise of the District's argument is that the county avoided conditioning its approval of the project on a potentially unlawful restriction against children and families; nevertheless, the trial court

12

credited the developer's *intent* to exclude families while refusing to consider the potentially discriminatory nature of that exclusion.

The trial court did not abuse its discretion by sustaining T&A's objections to the evidence regarding discrimination. Both parties recognize that whether the project's adults-only designation could be challenged under fair housing laws is not at issue in this case. Instead, the District seeks to show that the county's approval of the project was formulated to refrain from imposing a condition that would preclude children, due to concerns about discrimination.

The District relies on a statement in the mitigated negative declaration finding in the board resolution approving the project. It says, "The project is not conditioned to preclude residents with children as this is what was requested in the application and evaluated in the Initial Study."[7] The District argues that the trial court improperly excluded evidence that provided context for this statement and revealed the county's concern about potential discrimination. For example, the District proffers the deposition testimony of the county's resource management agency manager, who testified that "[w]e came to the uncomfortable solution . . . that the request to limit the occupants would come from the applicant and the county would simply be responding to the applicant's request. And so the county would not be in a position of conditioning a project to exclude anybody." The District maintains that the excluded evidence was relevant both to challenge T&A's claim that families would not be allowed based on the project

---

[7] The cited statement appears in a finding responding to public comment related to the impact on public services. The entire passage reads: "The Initial Study evaluated that no students would be generated by the project because the project is defined as employee housing with no dependents. The applicant has alternative housing available for employees with families . . . . *The project is not conditioned to preclude residents with children as this is what was requested in the application and evaluated in the Initial Study.* Any change to this would require an amendment to this Combined Development Permit." (Italics added.)

13

approval and to illustrate why the District was not required to anticipate and analyze the school facilities impact of a housing subtype that is potentially unlawful.

The District's focus on the county's ostensible effort to sidestep the exclusionary condition distracts from what was actually approved. The conditions of approval for the combined development permit plainly state that "[t]he project is for agricultural employees only, without dependents." This condition is reinforced throughout the board resolution approving the project, including in the project description findings, the consistency findings, and the mitigated negative declaration findings.[8] What is more, the conditions of approval are recorded in an agreement between T&A and the county, which by its terms is given binding effect as a covenant running with the land. Any change to these conditions would require an amendment to the combined development permit.

By contrast, the statement touted by the District as showing the project was not conditioned to preclude residents with children appears only once, in a paragraph responding to public comment related to the impact on public services. It is, at best, ambiguous in meaning and contradictory of the condition of approval which states that the project is for agricultural employees only, without dependents. This evidence does not negate the conditions of approval and the recorded agreement. Accordingly, we find

---

[8] For example, the project description findings note that T&A "provides housing for employees with dependents at other locations . . . ." The consistency finding references a county ordinance for farmworker housing and explains that "[n]o children's play area is provided because it is expected that the occupants of the units will be employees without dependents." The findings in response to public comment about compliance with federal and state housing guidelines, as well as about impacts on the affected elementary school district (which is not the subject of this case), state that federal guidelines referring to rural development of multi-family rental housing units do not apply, that "[i]f families occupy the units, the applicant would be required to apply for an amendment to the General Development Plan," and that "[i]f the project description ever changes, the applicant will be required to apply for an amendment to the [general development plan] which would trigger additional environmental review and consideration of the impact on schools."

14

that it is not the developer's stated intent but the recorded terms of government agency approval that determine project "type" for purposes of the reasonable relationship analysis under the applicable statutes.

### 2. *The Statutory Scheme Does Not Mandate Analysis of the Adult Employees-only Housing Project as a Distinct "Type" of Residential Development*

We turn to whether the District was required to separately analyze the projected impact of agricultural employee-only housing on school facilities as a "type" of residential development under the reasonable relationship test. The pivotal issue is how the reasonable relationship requirement under section 66001 applies in this scenario.

The District and amici curiae stress that designation of the project as agricultural employee housing does not qualify it as a separate "type" of residential development within the meaning of section 66001 and outside the scope of the Level 2 fee for new residential construction. The District emphasizes that the statutory language and case authority do not require project-specific reasonable relationship findings for the imposition of a districtwide school impact fee. The District also points to exceptions in the statute for certain types of development, including government-financed agricultural migrant worker housing, to show that non-excepted types of development come within the umbrella of residential construction.

T&A relies on the same statutory language as support for its contention that the District's SFNA findings simply do not address an adult employees-only type of housing that will not generate additional students for the district. T&A requests that this court take judicial notice of local code sections that define "agricultural employee housing" as a housing type. T&A also cites the *Warmington* and *Cresta Bella* decisions as reinforcement for its position that a school district's reasonable relationship findings do not support the imposition of school impact fees where the fee study does not address the

15

type of construction being proposed, even if the study adequately addresses the projected impact of residential development generally.

There is no dispute for purposes of this appeal that the District was authorized to establish a school impact fee to fund facilities necessitated by new residential development in the District's service area.[9] T&A's protest action challenges the fee "as applied" to the project, arguing that the District incorrectly assumed that all "residential development projects, regardless of type" would generate additional students for the district. T&A does not contest, as a general matter, the District's adoption of the Level 2 fee based on the District's needs analysis.

The trial court took a similar view, finding "no facts to support a reasonable relationship between the fees and the project's impact on school enrollment" since "no children would live in this type of development." The court rejected "an overbroad label in a fee study that does not account for a project's actual impact." The trial court's reasoning is logically sound and thoughtfully articulated. We find, however, that it fails to reconcile its project-specific focus with the controlling statutes. As stated earlier, we accord no deference to the trial court's decision and review the District's action only to determine whether it was arbitrary, capricious, or lacking evidentiary support. (*SummerHill*, *supra*, 30 Cal.App.5th at pp. 552-553.)

We are not convinced that the unique or atypical designation of a residential development—in this case restricting occupancy to seasonal farmworkers without dependents—qualifies it for separate consideration as a "type" of residential development under the relevant statutes. "In interpreting a statute, our primary goal is to determine and give effect to the underlying purpose of the law. [Citation.] 'Our first step is to

---

[9] Other grounds raised in T&A's petition for writ of mandate and complaint challenging the Level 2 fee imposed against it, including timeliness, are not at issue in this appeal.

16

scrutinize the actual words of the statute, giving them a plain and commonsense meaning.' [Citation.] ' "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." ' [Citation.] In other words, we are not free to 'give words an effect different from the plain and direct import of the terms used.' " (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) Furthermore, "[t]he words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 (*Dyna-Med*).) "To determine the most reasonable interpretation of a statute, we look to its legislative history and background." (*Goodman v. Lozano*, *supra*, at p. 1332.)

The Mitigation Fee Act broadly defines "development project" as "any project undertaken for the purpose of development." (§ 66000, subd. (a).) This makes sense because section 66001 is not limited to school impact fees but "governs a wide range of local agency actions taken under differing statutory requirements." (*Garrick*, *supra*, 3 Cal.App.4th at p. 336.) There are two ways that a local agency—here the District—can satisfy the Mitigation Fee Act's "reasonable relationship" requirement for the imposition of developer fees. Section 66001, subdivision (a) requires in relevant part the determination of a reasonable relationship between both "the fee's use and the type of development project on which the fee is imposed" (*id*., subd. (a)(3)) and "the need for the public facility and the type of development project on which the fee is imposed." (*Id*., subd. (a)(4).) Section 66001, subdivision (b) requires the more specific determination of "a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed."

17

In *Garrick*, the Court of Appeal explained that section 66001, subdivision (a)'s reference to "use and need in relation to a 'type' of development project . . . applies to an initial, quasi-legislative adoption of development fees" (*Garrick*, *supra*, 3 Cal.App.4th at p. 336), whereas section 66001, subdivision (b) "applies to adjudicatory, case-by-case actions" (*ibid*.). The difference between subdivisions (a) and (b) of section 66001 is revealing because only the latter demands information pertaining to an individual development. (*Garrick*, *supra*, at pp. 335-336.) By contrast, section 66001, subdivision (a) "clearly applies to decisions to impose fees on a *class* of development projects rather than particular ones." (*Garrick*, *supra*, at p. 335.) "The fact that subdivision (a) speaks of a relationship between the use and need on one hand and the 'type' of development on the other . . . defeats any argument that some nexus must be found between the fee and a *particular* project on which it is imposed." (*Ibid*.)

We emphasize the language of section 66001, subdivision (a) because T&A's briefing on appeal at times blurs this distinction, suggesting that the District needed to identify a reasonable relationship "between the purpose of the fee, the amount of the fee, and the projected impacts of the project the fee is imposed on." That depiction is subtly inaccurate. The District's adoption of a prospective, districtwide Level 2 fee was quasi-legislative. As shown above, the plain language of section 66001, subdivision (a) focuses the reasonable relationship test on "type" or class of development and the fee's use and need for the facility (§ 66001, subd. (a)), not on the project itself (cf. § 66001, subd. (b)). Viewed in relation to "development project" as defined in section 66000, use of the word "type" in section 66001, subdivision (a)(3) and (a)(4) provides the agency a realistic means of fulfilling its statutory mandate to determine reasonableness when adopting a fee of general applicability. In other words, "type" in the context of section 66001, subdivision (a) allows an agency to impose a general fee reasonably related to projected development impacts without tying its analysis to an individual

18

project.  It is a generic enabler for an agency to proceed with a quasi-legislative determination.

To discern what a "type" of development project means in any specific context—here the imposition of school impact fees—requires us to look beyond section 66001 to the statutory framework governing the subject of the fee.  In doing so, we attempt to construe the statutory provisions in a way that is internally consistent and reasonable in view of the statute's plain meaning, legislative history, and background (*Goodman v. Lozano*, *supra*, 47 Cal.4th at p. 1332), paying in this case close attention to the Legislature's treatment of residential development.

The authorizing statute for school impact fees identifies three categories of construction against which a school district's governing board may levy a fee.  (Ed. Code, § 17620, subd. (a)(1).)  These are "new commercial and industrial construction" (*id*., § 17620, subd. (a)(1)(A)), "new residential construction" (*id*., § 17620, subd. (a)(1)(B)), and subject to specified limitations, "other residential construction, only if the resulting increase in assessable space exceeds 500 square feet" (*id*., § 17620, subd. (a)(1)(C)).  "[C]onstruction" means "new construction and reconstruction of existing building for residential, commercial, or industrial."  (Gov. Code, § 65995, subd. (d); Ed. Code, § 17620, subd. (a)(2).)  The definition excludes certain facilities, such as those that are "used exclusively for religious purposes" or that are government "owned and occupied . . . ."  (§ 65995, subd. (d).)  It also categorizes hotels, inns, and "other lodging for which the maximum term of occupancy for guests does not exceed 30 days" as " 'commercial or industrial construction' " but excludes from the commercial/industrial category "any residential hotel . . . ."  (*Ibid*.)

Connecting these definitions to the Mitigation Fee Act requirements, it appears that the "type of development project on which the fee is imposed" (§ 66001, subd. (a)(3)) in the context of school impact fees means, at a minimum, residential, commercial, or industrial construction.  (Ed. Code, § 17620; Gov. Code, § 65995,

19

subd. (d).)  The statutory language also provides guidance on what comprises residential construction.  First, the statute defines the development of short-term lodging like hotels and inns as commercial or industrial, but that of longer-term lodging (exceeding 30 days) as residential (§ 65995, subd. (d)), suggesting that housing in which a person resides for more than 30 days—though outside the traditional single-family or multi-family arrangement—qualifies as residential for the purpose of calculating school impact fees.  Second, the statute limits the authorization of Level 2 fees under section 65995.5 to "residential construction" (§ 65995.5, subd. (a)) as justified in the school facilities needs analysis pursuant to section 65995.6.  (§ 65995.5, subd. (b)(2).)

In this second category, the statutory formula to calculate the maximum allowable Level 2 "square foot fee" (§ 65995.5, subd. (c)) requires the sum cost, derived in part from the number of unhoused pupils, to be divided "by the projected *total square footage of assessable space of residential units anticipated to be constructed during the next five-year period* in the school district or the city and county in which the school district is located" (§ 65995.5, subd. (c)(3), italics added).  The term " '[r]esidential units' . . . means the development of single-family detached housing units, single-family attached housing units, manufactured homes and mobilehomes, . . . condominiums, and multifamily housing units, including apartments, residential hotels, . . . and stock cooperatives . . . ."[10]  (§ 65995.5, subd. (g).)  The statute reinforces that an authorized fee "shall be expended solely on the school facilities identified in the needs analysis as being

_____

[10] " 'Residential hotel' means any building containing six or more guestrooms or efficiency units . . . , intended or designed to be used . . . for sleeping purposes by guests, which is also the primary residence of those guests . . . ."  (Health & Saf. Code, § 50519, subd. (b)(1).)

" 'Stock cooperative' means a development in which a corporation is formed or availed of, primarily for the purpose of holding title to . . . improved real property, and . . . the shareholders of the corporation receive a right of exclusive occupancy in a portion of the real property, title to which is held by the corporation."  (Civ. Code, § 4190, subd. (a).)

20

attributable to projected enrollment growth from the construction of new residential units."  (§ 65995.5, subd. (f).)

The same definition of "residential units" applies to section 65995.6, governing the SFNA.  (§ 65995.5, subd. (g).)  The statute directs the school district to base its projection of unhoused pupils "generated by new residential units" on the "historical student generation rates of new residential units constructed during the previous five years *that are of a similar type of unit* to those anticipated to be constructed either in the school district or the city or county in which the school district is located . . . .  For purposes of this paragraph, 'type' means a single family detached, single family attached, or multifamily unit."  (§ 65995.6, subd. (a), italics added.)

Despite the breadth of housing arrangements defined as "residential" under section 65995.5, none describe employee-only housing like that proposed by T&A.  It is therefore unsurprising that, as T&A points out, neither the District's board resolution adopting the Level 2 fee, nor the needs analysis it relied on, address "an adult agricultural employee-only type of residential development that will not allow children or other non-employee dependents."[11]  It also places the District in a predicament.  Is a school district required to anticipate and analyze a unique subtype of residential development that is not contemplated in the authorizing statutes but according to its designated use poses a lesser or different burden than the subtypes identified in the statute that comprise residential development generally?  We believe the answer is no, based upon several guideposts in the statutory scheme.

---

[11] The District identified the "types of new residential development" in the needs analysis as "including but not limited to single- and multi-family units . . . , single- and multi-family units in redevelopment projects, single- and multi-family units that replace demolished units (to the extent that the new units are larger than the demolished units), additions of residential space to existing single- and multi-family units, manufactured homes, mobile homes and condominiums . . . ."

21

The first of these guideposts, discussed above, is the language of section 66001, subdivision (a) as it pertains to quasi-legislative determinations by a government agency. We concluded that tying the reasonable relationship standard to "the type of development project on which the fee is imposed" (§ 66001, subd. (a)(3), (4)) enables quasi-legislative action. In this case, for example, the District established the Level 2 fee prospectively upon "residential construction of $3.00 per square foot of residential development" located within its service area. To construe "type of development project" more narrowly risks conflating the statutory distinction between subdivision (a) of section 66001, as it applies to quasi-legislative fee determinations, and subdivision (b), as it applies to adjudicatory or ad-hoc fee determinations.

*Garrick* provides insight into this distinction. The school district in *Garrick* imposed school impact fees on new residential development under former Government Code section 53080 (now Education Code section 17620) and section 65995. (*Garrick*, *supra*, 3 Cal.App.4th at p. 324.) The developer challenged the fees by arguing in part that section 66001 required "site-specific information." (*Garrick*, *supra*, at p. 335.) The court rejected this interpretation of the statute, which would have applied the site-specific analysis required under subdivision (b) of section 66001 to subdivision (a). (*Garrick*, *supra*, at p. 336.) *Garrick* observed that adjudicatory-stage findings were not required for residential projects. (*Ibid*.) To the contrary, "[t]he Legislature was apparently satisfied that a need for new school facilities based generally on projected new residential development was nexus enough as a matter of law, without a need for case-by-case adjudication, so long as fees did not exceed the prescribed maximum rate." (*Id*. at pp. 336-337.) The court thus rejected the developer's claim that the fee was invalid because the school district's report failed to show "a 'close connection' " between new development and the fees to be imposed using site-specific data. (*Id*. at p. 333.) As the court explained, "[t]he fee at issue here is a general one applied to all new residential development and valid if supported by a reasonable relationship between the amount of

22

the fee and estimated cost of services.  Site-specific review is neither available nor needed."  (*Id*. at p. 334.)

The observation that future facilities needs based on projected residential development provides a sufficient nexus to satisfy section 66001 finds support in the relevant legislative history.  In enacting former section 53080, the Legislature declared the need for "a comprehensive school facilities finance program" (Stats. 1986, ch. 887, § 7(d), p. 3080) to address overcrowded school facilities due to development and population growth in many areas of the state.  (Stats. 1986, ch. 887, § 7(a), p. 3080.)  It found "that the levying of appropriate fees by school district governing boards at the rates authorized by this act is a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district."  (Stats. 1986, ch. 887, § 7(e), p. 3080; see also *Shapell*, *supra*, 1 Cal.App.4th at p. 243 [noting that based on the enabling legislation, "a strong argument could be made . . . as a matter of law that the requisite nexus exists linking new development to the need for new school facilities . . . ."].)

Although Education Code section 17620 replaced former Government Code section 53080, the substance of the statute remained largely the same.  (See Legis. Counsel's Dig., Sen. Bill No. 1562 (1995-1996 Reg. Sess.) [describing repeal of former § 53080 and addition of Ed. Code, § 17620 as "technical, nonsubstantive" and to "be construed as a restatement and not as a new enactment"].)  The original legislative purpose thus remains relevant to our consideration.  (*Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 406 [reviewing court "may draw on the legislative history" of a statute's "earlier form for whatever light it may shed on the purpose of that legislative scheme"].)  This provides some indication that for quasi-legislative actions to impose school impact fees on new residential development, a nexus analysis based on general "type" of development, i.e., residential, may be adequate.

23

The second guidepost is that in crafting the law that authorizes the imposition of school impact fees and governs their implementation, the Legislature expressly occupied the field. It elected to "occup[y] the subject matter of requirements related to school facilities levied or imposed in connection with, or made a condition of, any land use approval, . . . to the exclusion of all other measures, financial or nonfinancial, on the subjects." (§ 65995, subd. (e).) In doing so, the Legislature sought to "gather[] all [school] financing under one umbrella and impose[] statewide uniformity on the process . . . ." (*Grupe*, *supra*, 4 Cal.4th at p. 919.)

It is significant that the resulting legislative scheme provides what appears to be a comprehensive set of definitions under the statutes and only limited, express exceptions for certain project subtypes. The statutes authorize a school district to levy a fee "against any construction within the boundaries of the district" (Ed. Code, § 17620, subd. (a)(1)), define "construction" broadly to mean the "construction and reconstruction of existing building for residential, commercial, or industrial" (§ 65995, subd. (d)), include a range of housing subtypes for consideration in assessing the impact of new residential construction, including residential hotels (§ 65995.5, subd. (g)), and even include short-term lodging like hotels under commercial or industrial construction (§ 65995, subd. (d)). The limited exceptions to imposition of school impact fees are facilities used exclusively for religious purposes, private day schools, and state-owned facilities (§ 65995, subd. (d)), senior citizen housing and residential care facilities for the elderly (§ 65995.1, subd. (a)), and government housing for agricultural migrant workers (§ 65995.1, subd. (b)).[12]

---

[12] Section 65995.1 limits fees on the construction of new senior citizen housing and residential care facilities for the elderly only to those applicable "in the case of commercial or industrial development." (§ 65995.1, subd. (a).) The statute entirely exempts from fees "agricultural migrant worker housing which is owned by the state and which is subject to a contract" under certain provisions of the Health and Safety Code. (§ 65995.1, subd. (b).)

The paradigm that emerges is one of comprehensive coverage of construction types with limited, explicit exceptions, and apparent sensitivity to treatment of housing types with minimal potential to add children to the school district (i.e., providing for senior housing and care facilities to be assessed as commercial or industrial). Yet the Legislature made no express provision for employee-only housing. Even more telling, the Legislature exempted *government*-financed agricultural migrant worker housing from school impact fees but omitted any mention of privately-financed farmworker housing. This leads us to infer that where the Legislature intended to carve out certain development subtypes, it did so.

The California Supreme Court's analysis of a class of fee types under section 65995 is instructive. In *Grupe*, the court determined that a school district's " 'special tax' " (*Grupe*, *supra*, 4 Cal.4th at p. 914) on residential property developers to fund new school construction was preempted by the statutory scheme as a " 'fee, charge, dedication, or other requirement' " within the meaning of section 65995. (*Grupe*, *supra*, at p. 919.) The court acknowledged that "section 65995 does not expressly list 'special taxes' among the exactions that it preempts . . . ." (*Id*. at p. 921.) However, the court reasoned that the "omission may well be explained by reference to history" (*ibid*.) in view of the problem the Legislature sought to resolve in section 65995 and of the "relative rarity and novelty" of special taxes (*Grupe*, *supra*, at p. 921). The court also emphasized that the same section "*expressly* excludes from the statute's reach" a certain class of special taxes but does not exclude *all* special taxes. (*Ibid*.) The court found it reasonable to infer from the Legislature's express specification to exclude one class of special taxes "that it intended that all other classes of special taxes fall within the statute. *Expressio unius est exclusio alterius*." (*Ibid*.)

So too here, the absence of any reference to employee-only or adult-only housing "may well be explained by reference to history" (*Grupe*, *supra*, 4 Cal.4th at p. 921) as well as by the apparent novelty of such a unique designation. Given the statute's broad

25

coverage of housing subtypes and exceptions, it is reasonable to interpret those that were *not* identified for special treatment under the authorizing statutes as subject to the general scheme. More specifically, the express exemption of government-financed agricultural migrant worker housing under section 65995.1 suggests that the Legislature intended for *non*-government-financed migrant farmworker housing to be subject to the general provisions for residential construction. The omission of any employee-specific housing among the types of residential units specified in the statute also makes it largely irrelevant for our purposes whether "agricultural employee housing" is in fact, as T&A contends, a distinct subtype of residential development under local law.[13]

The court in *Loyola Marymount University v. Los Angeles Unified School Dist.* (1996) 45 Cal.App.4th 1256 (*Loyola*) drew a similar conclusion in deciding whether the private university's construction of a new business school was subject to the imposition of impact fees as commercial construction under former section 53080. (*Loyola*, *supra*,

---

[13] T&A requests that this court take judicial notice of sections of the Monterey County Code of Ordinances (MCCO) that pertain to agricultural employee housing. These include MCCO section 21.06.014, which defines "agricultural employee housing," and section 21.66.060, which regulates the permitting of agricultural employee housing. T&A contends that these ordinance sections are relevant to the District's argument that the project is not a separate "type" of residential development from that addressed in the SFNA to support imposition of the Level 2 fee. The District opposes the request for judicial notice on the grounds that it failed at the outset to satisfy the requirements of California Rules of Court, rule 8.252(a), and has not justified presenting the MCCO sections for the first time on appeal. T&A responds that although the MCCO sections were not presented to the trial court, as legal authority they fall outside the general rule that reviewing courts should not take judicial notice of evidence not in the record before the trial court. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444.)

Evidence Code section 459 requires this court to take judicial notice of the requested MCCO sections even though they were not presented to the trial court for judicial notice. (Evid. Code, § 451, subd. (a) ["Judicial notice *shall* be taken of . . . public statutory law of this state"] (italics added); *id.*, 459, subd. (a) ["The reviewing court shall take judicial notice of . . . each matter that the trial court was required to notice under Section 451"]; see Cal. Rules of Court, rule 8.252(a).)

26

at p. 1259.) The court reasoned, based on the words and definitions in the statute, that "the Legislature intended to include virtually all construction except that exempted by sections 65995 et seq." (*Id*. at p. 1261.) It rejected the argument that the construction project was excluded because " 'educational' " or " 'university' " were not among the categories of commercial development listed in the statute, noting the statutory language used the phrase " 'include' " as " 'a term of enlargement rather than limitation.' " (*Id*. at p. 1262.) It also rejected the contention that the university's educational and nonprofit status placed it outside the statute's commercial use category. (*Id*. at pp. 1265-1266.) The court viewed the university's position as counter to "[t]he fact that the Legislature explicitly exempted state entities, as well as facilities used exclusively for religious purposes, but failed to mention private universities or colleges for exemptions . . . ." (*Id*. at pp. 1266-1267.)

We agree with the assessment in *Loyola*. To construe the designation of agricultural employee-only housing as a distinct "type" would contravene the Legislature's intent "to include virtually all construction except that exempted by sections 65995 et seq." (*Loyola*, *supra*, 45 Cal.App.4th at p. 1261.) Put differently, the adult-only restriction on the employee housing complex does not alter or expand the range of housing defined as "residential" under section 65995.5, subdivision (g), which a school district might be expected to analyze in the school facilities needs analysis under section 65995.6. The decisions in *Warmington* and *Cresta Bella*—which we believe are distinguishable—help to illustrate this point.

Both cases involved the imposition of school impact fees on residential redevelopment, and each time the court found that the fee study failed to determine a reasonable relationship between redevelopment construction on preexisting square footage and school facilities needs. (*Cresta Bella*, *supra*, 218 Cal.App.4th at p. 453; *Warmington*, *supra*, 101 Cal.App.4th at p. 862.)

27

In *Warmington*, the redevelopment project decreased the number of residential housing units from 56 apartment units to 38 single family homes. (*Warmington*, *supra*, 101 Cal.App.4th at p. 846.) The court first examined the application of school impact fees on redevelopment construction as a matter of statutory interpretation. (*Id*. at pp. 845, 850-857.) It found based upon the statutory scheme and legislative history that the statute did not mandate exclusion of redevelopment construction from the imposition of school-impact fees; however, to charge fees on preexisting square footage, a school district had to make the required nexus findings under section 66001, subdivision (a). (*Warmington*, *supra*, at p. 857.) Regarding that nexus requirement, the court found that the fee imposed on the project was invalid because the fee study did not address "the class of redevelopment construction that displaces existing residential housing on the same site" (*id*. at p. 862) and also contained no analysis to justify imposing a fee on redevelopment that would generate fewer students than before. (*Id*. at p. 860.) The court concluded that there was no evidence to support the imposition of school impact fees on preexisting square footage and affirmed a refund of those fees. (*Id*. at pp. 847, 862, 867.)

*Cresta Bella* closely followed *Warmington*. (*Cresta Bella*, *supra*, 218 Cal.App.4th at pp. 442, 451.) The school district's needs analysis calculated a Level 2 fee based on projected residential construction in the district, estimating that some of the new units would come from redevelopment based on the demolition and replacement of existing units. (*Id*. at p. 449.) Because the estimated "actual cost impact" of the projected residential development exceeded the maximum Level 2 fee under the statute, the school district determined it would be " 'fully justified' in levying the Level 2 fee on *all* new residential units, including on units that replace existing units." (*Id*. at p. 450.) The appellate court rejected this approach. It echoed the *Warmington* court in interpreting the reasonable relationship standard "to require a showing that reconstruction of preexisting square footage *also contributes to an increase in student population*." (*Id*. at p. 451.)

28

The appellate court reasoned that contrary to showing a connection between replacement of preexisting square footage and the generation of new students, the district's needs analysis in fact found that "replacement of preexisting units does *not* generate new students because the units were already in existence prior to the new construction." (*Cresta Bella*, *supra*, 218 Cal.App.4th at p. 453.) The court recognized the possibility that housing reconstruction "could support a correlation between reconstruction of preexisting residential units and the generation of new students" but concluded that the school district did not make such a showing. (*Ibid*.) Consequently, the court ordered the trial court to grant the writ of mandate for a partial refund to the developer based on the portion of fees derived from preexisting square footage. (*Id*. at p. 454.)

T&A contends that *Warmington* and *Cresta Bella* support its position that a fee study that analyzes only general types of residential development cannot be the basis for imposing impact fees on a different type of residential project that was not considered in the study and that has different impacts from those studied. But in both of those cases, the "type" of project not considered was redevelopment construction, a class whose distinguishing characteristic (being built upon preexisting square footage) is readily compatible with analysis in a fee study using historic data per the statute.

Here, by contrast, the distinguishing characteristic that renders imposition of the Level 2 fee problematic is the project's designation for adults only, without dependents. Unlike the general category of redevelopment construction, this designation is not itself a "type" contemplated in the statute (as shown above), and it is highly project specific. Because the Legislature did not identify adults-only or even employee specific housing for either an exception or alternative treatment under the statute, we believe it would be incongruous to fault the needs analysis for failing to consider it.

The third guidepost is practical. "Statutes are to be given a reasonable and commonsense interpretation consistent with the apparent legislative purpose and intent

'and which, when applied, will result in wise policy rather than mischief or absurdity.' " (*Dyna-Med*, *supra*, 43 Cal.3d at p. 1392.) Thus, when a court encounters uncertainty in interpreting a statute, the court should consider "the consequences that will flow from a particular interpretation." (*Id*. at p. 1387.)

We recognize that there are contrary views about what is the "reasonable and commonsense interpretation" (*Dyna-Med*, *supra*, 43 Cal.3d at p. 1392) of the statutes here. What is more, both sides present interests that fulfill important needs in the affected community—those being T&A's provision of housing for migrant farmworkers in the Salinas Valley, and the District's effort to fund school facilities for its overburdened schools.

According to T&A, the District's needs analysis failed to establish the requisite reasonable relationship because it neither addressed "a type of residential project that will not allow children" nor proposed a method to estimate whether such a project "will in fact generate additional students." But to adopt T&A's position would have the practical effect of requiring a school district to expand its needs analysis to address the projected impact on school facilities of undefined, variant subtypes of residential construction not contemplated in the statute. We find such a consequence inconsistent with the purpose of section 66001, insofar as subdivision (a) enables the imposition of quasi-legislative fees that are applied prospectively. (See *Shapell*, *supra*, 1 Cal.App.4th at pp. 231-232.)

However strained the connection between the findings of the District's SFNA and the application of the Level 2 fee to T&A's adults-only project, the alternative would be an untenable reading of the statute in which we construe section 66001, subdivision (a) to demand a level of specificity similar or equivalent to what subdivision (b) already provides. In our view, this would violate the tenant of statutory construction whereby the " ' " 'court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' " ' " (*Haniff v. Superior Court* (2017) 9 Cal.App.5th 191, 202.)

30

Nor are we persuaded by T&A's contention that the imposition of the fee on its project contradicts the nexus and proportionality principles that underlie the reasonable relationship standard. (See *Ehrlich*, *supra*, 12 Cal.4th at p. 860.) The California Supreme Court has clarified that the heightened scrutiny applicable to a monetary exaction imposed ad hoc "on an individual and discretionary basis" (*id*. at p. 876) does *not* apply to a challenge involving the quasi-legislative application of developer fees. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 669-670.) The court in *San Remo Hotel* declined the invitation to extend heightened takings scrutiny to all development fees, adhering instead to the distinction "[drawn] in *Erlich* . . . between ad hoc exactions and legislatively mandated, formulaic mitigation fees." (*Id*. at pp. 670-671.) The court emphasized that fees *not* subject to heightened scrutiny remain subject to the means-end judicial review, including under statutory law pursuant to section 66001. (*San Remo Hotel*, *supra*, at p. 671.) While the required showing "need not be so close or so thoroughly established for legislatively imposed fees as for ad hoc fees . . . , the arbitrary and extortionate use of purported mitigation fees, even where legislatively mandated, will not pass . . . muster." (*Ibid*.)

We conclude, based on our review of the statutory schemes, that the District was not required to anticipate and analyze agricultural employee-only housing (as a distinct subtype of residential housing) in the school facilities needs analysis under section 65995.6 for purposes of satisfying the reasonable relationship requirement under section 66001, subdivision (a).

### 3. *Imposition of the Level 2 Fee Was Not Arbitrary or Capricious*

Our conclusion that the District was not required under the statutes to analyze adult-employee-only housing as a separate "type" of development project leads us to conclude that the District did not act arbitrarily in imposing the Level 2 fee on T&A's project.

There is no dispute for purposes of this appeal that T&A's agricultural employee housing project is "residential."[14] We noted earlier that T&A has not challenged the adequacy of the District's needs analysis or the imposition of the Level 2 fee on residential development in the District's service area. The SFNA determined based on the historical data it had collected that "[a]ll types of new residential development . . . are projected to cause new families to move into the District and, consequently, generate additional students in the District." The SFNA also found that the District was operating over capacity at the 9 through 12 grade levels and did not have sufficient school facilities for the projected growth. The SFNA calculated the Level 2 fee and, citing section 66001, tied the use of the fee "to the type of projects (new residential developments) upon which it is imposed" and to the "need for additional school facilities . . . ." The District's governing board adopted the SFNA, made related findings, and established the Level 2 fee in the amount of $3 per square foot of residential development located within the service area.

Nothing in the record or in T&A's opposition on appeal suggests that the District's methodology was invalid or failed to satisfy the three-part showing articulated in *Shapell*. The SFNA projected the total amount of new residential units expected to be built, approximated the number of students that would be generated by the new housing, and estimated the related cost-burden imposed on the District's school facilities. (See *Shapell*, *supra*, 1 Cal.App.4th at p. 235.) As far as residential development, the District "engaged in a reasoned analysis designed to establish the requisite connection between the amount of the fee imposed and the burden created." (*Ibid.*)

---

[14] The record reflects that early discussions between the county and the District's sister school district for grades K through 8 grappled with whether the commercial rate or the residential rate should apply to T&A's project.

The argument that the District lacked evidentiary support and failed to demonstrate a rational connection between the Level 2 fee and the project turns on the unique designation of the project as *adults*-only employee housing. That is, the question of a sufficient, reasonable relationship to the school impact fees arises only by virtue of the project's designation as housing for adults only, without dependents. But the feature of being restricted to adults is entirely project specific. It returns us full circle to whether T&A's project constituted a distinct "type" of development project requiring separate analysis under both section 66001 and the school impact fees statutory scheme. Having dispensed with that question as a matter of statutory interpretation and legislative purpose, we conclude that the District's imposition of the Level 2 fee on new residential construction in its service area, including on T&A's agricultural employee housing project, was not arbitrary or lacking in evidentiary support. Simply put, while we recognize that the SFNA does not analyze employee-only housing *with no children*, we have already established that such project-level specificity is not required.

Because the District met its initial burden of demonstrating the validity of the Level 2 fee as based upon a reasonable relationship between the fee charged and the burden posed by residential development in its service area, we turn to T&A's showing in the protest action. (*Home Builders*, *supra*, 185 Cal.App.4th at p. 561; cf. *Cresta Bella*, *supra*, 218 Cal.App.4th at p. 453.) There is no question that T&A has established, based upon the recorded conditions of approval for the combined development permit, that the project is permitted for adult employees, without dependents. T&A has not shown, however, that the determinations underlying the District's SFNA were unsupported by the record, such that the fee's use and the need for the school facility are not reasonably related to the agricultural employee housing project. (*Home Builders*, *supra*, at p. 561.)

The Van Camp declaration, for example, states that T&A's seasonal farmworkers leave their children at permanent homes in other locations during the seven-month growing season, including with relatives if both parents come to work. That may be the

33

case; but as the District points out, it is also possible that children accompany a parent or parents for the seven-month season, and whether placed with local friends, relatives, or elsewhere, those children enroll in school. Without any supporting documentation, the Van Camp declaration is inadequate to disturb the District's districtwide assessment of the impact of new residential housing. (See *Loyola*, *supra*, 45 Cal.App.4th at p. 1264 [finding the declaration of the university's vice president, stating that the construction of a new business school would not increase students or faculty, was inadequate as evidence to overcome the application of the impact fees].)

T&A also points to the limits of the SFNA conducted by the District. Kevin Sullivan, who oversaw the SFNA in this case, testified that in his understanding, all development is classified as either commercial/industrial or residential, and all residential development generates additional students and is subject to paying school fees unless it is senior-restricted housing (and thus charged a commercial/industrial rate) or it satisfies a statutory exemption. Sullivan also acknowledged that the student generation rate analysis for the SFNA did not include any kind of residential development that does not allow children. According to T&A, Sullivan's explanation demonstrates that the proposition that all types of new residential development are projected to cause new families to move into the district and generate additional students was "an assumption not supported by any facts in the SFNA."

This circular reasoning is not persuasive when we consider that the information purportedly missing from the District's SFNA is a uniquely specific feature of the agricultural employee housing project which neither alters the "type" of construction subject to fees under the statute (see Gov. Code, §§ 66001, subd. (a), 65995, subd. (d); Ed. Code, § 17620, subd. (a)(1)(A)-(C)) nor qualifies for any legislatively-determined exception or exemption (see §§ 65995, subd. (d), 65995.1).

In sum, the Legislature deemed school impact fees to be "a reasonable method of financing the expansion and construction of school facilities resulting from new

34

economic development within the district." (Stats. 1986, ch. 887, § 7(e), p. 3080.) The authorizing statute is correspondingly broad. It evinces an intent to mitigate impacts on school facilities from economic development not limited to single- and multi-family residential construction, but "against any construction within the boundaries of the district." (Ed. Code, § 17620, subd. (a)(1).) Employee-only housing (restricted, moreover, to adult occupancy) is undeniably not among the "types" of residential units specified for an alternative fee under section 65995.5; but neither do the range of housing arrangements defined as residential exclude such a configuration. Finally, the Legislature's express treatment of certain housing types—most notably the exclusion of agricultural migrant worker housing financed by the government from the school impact fee scheme (§ 65995.1) suggests that other potential "subtypes" of residential construction are not considered distinct for purposes of the reasonable relationship test under section 66001.

We conclude that the statutory scheme does not require separate analysis of "subtypes" of residential development not contemplated by the statute. As a result, the District's needs analysis adequately determined a reasonable relationship between the Level 2 fee's use, the need for school facilities, and new residential development in the District. Imposition of the Level 2 fee was not arbitrary or entirely lacking in evidentiary support for failing to account for the actual impact of T&A's adults-only project, because nothing in the statute requires the school district imposing a quasi-legislative fee to justify its action based on a project's actual impact.

## III.    DISPOSITION

The judgment is reversed. Costs on appeal are awarded to the Salinas Union High School District.

35

_____

Greenwood, P.J.

WE CONCUR:

_____

Elia, J.

_____

Grover, J.

Tanimura & Antle Fresh Foods, Inc. v. Salinas Union High School District
H045470

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court No. 16CV000616 |
| Trial Judge: | Hon. Thomas W. Wills |
| Counsel for Defendant/Appellant:<br>Salinas Union High School District | Davis & Young<br>Steven B. Dippell<br><br>Lozano Smith<br>Devon Lincoln |
| Counsel for Plaintiff/Respondent:<br>Tanimura & Antle Fresh Foods, Inc. | Miles J. Dolinger |
| Amici Curiae on behalf of<br>Defendant/Appellant:<br>Salinas Union High School District | Atkinson, Andelson, Loya, Ruud &<br>Romo<br>Martin A. Hom<br>Jennifer D. Cantrell<br><br>Dannis Woliver Kelley<br>Clarissa R. Canady<br>Jessika K. Johnson<br><br>California School Boards Association<br>Elaine M. Yama-Garcia<br>D. Michael Ambrose |

Tanimura & Antle Fresh Foods, Inc. v. Salinas Union High School District
H045470