Filed 10/19/22

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| GEORGE SHEETZ, | C093682 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20170255) |
| v. | |
| COUNTY OF EL DORADO, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of El Dorado County, Dylan Sullivan, Judge. Affirmed.

FisherBroyles, Paul James Beard II, Matthew Howard Weiner for Plaintiff and Appellant.

Abbott & Kindermann, Glen C. Hansen; David Anthony Livingston, County Counsel for Defendant and Respondent.

This is a land-use regulation case. Plaintiff George Sheetz challenges the $23,420 traffic impact mitigation fee (TIM fee or fee) imposed by defendant El Dorado County (County) as a condition of issuing him a building permit for the construction of a single-family residence on his property in Placerville. Sheetz appeals from the judgment entered after the trial court sustained the County's demurrer without leave to amend and denied his verified petition for writ of mandate. He contends reversal is required because the TIM fee is invalid under both the Mitigation Fee Act (Gov. Code, § 66000 et seq.)[1] and the takings clause of the United States constitution, namely the special application of the "unconstitutional conditions doctrine" in the context of land-use exactions established in *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*). Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

In July 2004, the County adopted a new general plan, titled "2004 El Dorado County General Plan A Plan for Managed Growth and Open Roads; A Plan for Quality Neighborhoods and Traffic Relief" (2004 General Plan or general plan). As relevant here, the general plan required that new development pay for road improvements necessary to mitigate the traffic impacts from such development.

In August 2006, the County permanently amended the general plan to include a traffic impact mitigation fee program (TIM fee program or program) to finance the construction of new roads and the widening of existing roads within its jurisdiction. Under the program, the County is authorized to impose a TIM fee as a condition to the approval of a building permit to mitigate the traffic impacts on state and local roads from new development. The fee is comprised of two components: the Highway 50 component

---

[1] Undesignated statutory references are to the Government Code.

2

and the local road component. The amount of the fee is generally based on the location of the project (i.e., the specific geographic zone within the County) and the type of project (e.g., single-family residential, multi-family residential, general commercial). The program requires that new development pay the full cost of constructing new roads and widening existing roads without regard to the cost specifically attributable to the particular project on which the fee is imposed. In assessing the fee, the County does not make any "individualized determinations" as to the nature and extent of the traffic impacts caused by a particular project on state and local roads.

In February 2012, the County adopted new TIM fee rates, including the fee rate challenged in this case.

In July 2016, Sheetz applied for a building permit to construct a 1,854-square-foot single-family manufactured home on his property in Placerville, which is located in geographic Zone 6. The County agreed to issue the permit on the condition that Sheetz pay a TIM fee in the amount of $23,420, consisting of $2,260 for Highway 50 improvements and $21,160 for local road improvements. After Sheetz paid the fee, the project was approved and the building permit issued in August 2016.

In December 2016, Sheetz sent a letter to the County in which he protested the validity of the TIM fee under the Mitigation Fee Act on various grounds. Thereafter, Sheetz sent the County additional letters reiterating his challenge to the fee and requesting a refund. The County did not respond to any of the letters.

*Procedural Background*

In June 2017, Sheetz filed a verified petition for writ of mandate and complaint for declaratory and injunctive relief, alleging seven causes of action challenging the validity

of the TIM fee and the program that authorized it.[2]  As for his state law claims, Sheetz asserted that the fee violated the Mitigation Fee Act because there is no "reasonable relationship" between both (1) the amount of the fee and the cost of the public facilities (i.e., road improvements) *specifically* attributable to his development project, and (2) the traffic impacts caused by his development project and the need for road improvements within the County.  Sheetz further asserted that the fee violated the Mitigation Fee Act because it included costs attributable to existing deficiencies in the County's "traffic infrastructure."  As for his federal claims, Sheetz asserted that the fee violated the takings clause of the United States constitution, specifically the special application of the "unconstitutional conditions doctrine" in the context of land-use exactions established in *Nollan* and *Dolan*, as the County failed to make an *individualized determination* that an "essential nexus" and "rough proportionality" existed between the traffic impacts caused by or attributable to his project and the need for improvements to state and local roads. Finally, Sheetz asserted that the fee was invalid under state law because the County's decision to impose the fee as a condition of issuing him a building permit was not supported by legally sufficient findings, and the findings were not supported by legally sufficient evidence.  Sheetz sought various relief, including the issuance of a peremptory writ of mandate directing the County to refund the fee, an order declaring that the County failed to demonstrate a "reasonable relationship" and/or "essential nexus" and "rough proportionality" between the fee and any adverse traffic impact caused by his development project, an order declaring invalid the County's policy of requiring new development to pay the full cost of constructing new roads and widening existing roads

---

[2]  Friends of El Dorado County, a nonprofit organization representing the interests of citizens and taxpayers who live and work in the County, was also a named petitioner/plaintiff in this case but is not a party to this appeal.

without regard to the cost specifically attributable to the particular project on which the fee is imposed, and an injunction preventing the County from enforcing this policy.

In April 2018, the trial court sustained the County's demurrer to the declaratory relief causes of action (second through seventh causes of action) without leave to amend, and overruled the demurrer to the petition for writ of mandate (first cause of action) on the ground that it stated a cognizable claim under the Mitigation Fee Act, specifically section 66001, subdivision (a). As relevant here, the court concluded the TIM fee was not subject to the requirements of *Nollan* and *Dolan* (and therefore did not violate the "unconstitutional conditions doctrine" as a matter of law) because it is a legislatively prescribed development fee that is generally applicable to a broad class of property owners. The court also concluded that Sheetz's declaratory relief causes of action, which sought a declaration that the fee and the program that authorized it violated the Mitigation Fee Act and the "unconstitutional conditions doctrine," failed as a matter of law because the facial challenges were time-barred and the sole remedy for the "as applied" challenges is administrative mandamus, not declaratory relief.

After the administrative record was completed and the parties submitted additional briefing, the trial court denied the petition for writ of mandate in November 2020. As for the state law claim, the court concluded the County had met its burden to produce evidence showing that it used a valid method for imposing the TIM fee, one that established a reasonable relationship between the fee charged and the burden posed by Sheetz's development project. The court further concluded Sheetz had failed to cite evidence in the administrative record showing that the fee was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair. Sheetz did not show that the record before the County clearly did not support the underlying determinations regarding the reasonableness of the relationship between the fee and the

development.[3]  In rejecting Sheetz's constitutional challenge under state law, the court found the administrative record established that the fee bore a reasonable relationship, in both intended use and amount, to the deleterious public impact of the project.  As for the federal claim, the trial court rejected Sheetz's constitutional challenge to the fee, concluding (as it did in ruling on the demurrer) that the fee was not subject to the requirements of *Nollan* and *Dolan* because it is a legislatively prescribed development fee that is generally applicable to a broad class of property owners.

Sheetz timely appealed.  He challenges the trial court's rulings with respect to his first (writ of mandate), fourth (declaratory relief), and fifth (declaratory relief) causes of action.

After delays in the briefing schedule, the case was fully briefed on May 4, 2022, and assigned to this panel on May 31, 2022.  The court scheduled oral argument and the case was argued and submitted on September 21, 2022.

## DISCUSSION

### I

*Governing Law*

A.  *Unconstitutional Conditions Doctrine*

The takings clause of the Fifth Amendment, made applicable to the states by the Fourteenth Amendment, "provides that private property shall not 'be taken for public use, without just compensation.' " (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536 (*Lingle*).)

---

[3]  In denying the writ petition as to Sheetz's claim under the Mitigation Fee Act, the trial court initially rejected Sheetz's contention that a local agency cannot impose a development impact fee as a condition to the approval of a development project without an *individualized* evaluation of the impact of the particular project on public facilities.  In so doing, the court concluded that only subdivision (a) of section 66001 applies, not both subdivision (a) and (b) of the statute, as Sheetz had argued.

The United States Supreme Court has identified two general categories of takings: "physical takings" and "regulatory takings." (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 321.) Apart from these two general categories of takings, the Supreme Court has also identified a "special" category of takings claims for "land-use exactions." (*Lingle, supra*, 544 U.S. at p. 538.) A land use-exaction occurs when the government demands real property or money from a land-use permit applicant as a condition of obtaining a development permit. (See *Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 599, 612, 616 (*Koontz*).) The leading examples of "exactions" come from the Supreme Court's decisions in *Nollan*, *Dolan*, and *Koontz*.

In *Nollan*, the California Coastal Commission conditioned its grant of a permit to landowners who sought to rebuild their house on their agreement to dedicate a public easement across their beachfront property. (*Nollan, supra*, 483 U.S. at p. 827.) In *Dolan*, a city conditioned its grant of a permit to a property owner who sought to increase the size of her existing retail business on her agreement to dedicate a portion of her property for flood control and traffic improvements. (*Dolan, supra*, 512 U.S. at p. 377.) And most recently in *Koontz*, a water district conditioned its grant of a permit to a landowner who sought to develop 3.7 acres of an undeveloped property on his agreement to either reduce the size of his development to 1 acre and dedicate a conservation easement on the remainder of the property (13.9 acres) or proceed with the development as proposed, building on 3.7 acres and deeding a conservation easement on the remainder of the property (11.2 acres), and pay money to improve certain public wetlands the water district owned. (*Koontz, supra*, 570 U.S. at pp. 601-602.)

To determine whether these types of demands are impermissible, courts apply a "special application of the 'doctrine of "unconstitutional conditions." ' " (*Lingle, supra*, 544 U.S. at p. 547.) Under that doctrine, the government may not ask a person to give up a constitutional right (e.g., the right to receive just compensation when property is taken

7

for a public use) "in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." (*Dolan, supra*, 512 U.S. at p. 385.)  In applying the doctrine in the context of land-use exactions, particular rules apply because of two competing realities surrounding land-use permits.  On the one hand, the government can take unreasonable advantage of landowners who seek a permit. "By conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation."  (*Koontz, supra*, 570 U.S. at pp. 604-605.)  On the other hand, the government often has legitimate interests in controlling or mitigating the effects of a particular development project. "Where a building proposal would substantially increase traffic congestion, for example, officials might condition permit approval on the owner's agreement to deed over the land needed to widen a public road."  (*Id*. at p. 605.)  To accommodate these competing realities, *Nollan* and *Dolan* establish that the government may condition approval of a land-use permit on the landowner's agreement to dedicate a portion of his property to the public "so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the [landowner's] proposal."  (*Id.* at pp. 605-606.)  Put another way, "[u]nder *Nollan* and *Dolan* the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts."  (*Id.* at p. 606.)

The standard established in *Nollan* and *Dolan* for assessing takings claims in the context of land-use exactions is commonly referred to as the "*Nollan/Dolan* test," which is viewed as a type of " 'heightened scrutiny.' "  (*Beach & Bluff Conservancy v. City of Solana Beach* (2018) 28 Cal.App.5th 244, 266.)  The *Nollan* part of the test is the "essential nexus" standard, i.e., there must be an "essential nexus" between the

8

government's legitimate state interest and the exaction imposed. (*Nollan, supra*, 483 U.S. at p. 837.) The *Dolan* part of the test is the "rough proportionality" standard with regard to the "degree of connection between the exactions and the projected impact of the proposed development." (*Dolan, supra*, 512 U.S. at p. 386.) The *Dolan* court concluded, "No precise mathematical calculation is required, but the [government] must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Id*. at p. 391.)

In *Koontz*, the United States Supreme Court extended the *Nollan/Dolan* test to "so-called 'monetary exactions' " demanded by the government as a condition for a land-use permit, that is, a monetary condition that is a substitute for the property owner's dedication of real property to the public which is intended to mitigate the environmental impact of the proposed project. (*Koontz, supra*, 570 U.S. at pp. 612, 619.) Because these " 'in lieu of' fees are utterly commonplace" and "functionally equivalent to other types of land use exactions," the Supreme Court concluded that they too must satisfy the "essential nexus" and "rough proportionality" requirements of *Nollan* and *Dolan*. (*Id.* at p. 612.)

Under California law, only certain development fees are subject to the heightened scrutiny of the *Nollan/Dolan* test. Our Supreme Court has held that the requirements of *Nollan* and *Dolan* apply to development fees imposed as a condition of permit approval where such fees are " 'imposed . . . neither generally nor ministerially, but on an individual and discretionary basis.' " (*San Remo Hotel L.P. v. City and County of San Francisco* (2002) 27 Cal.4th 643, 666-670 (*San Remo Hotel*); *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 859-860, 866-867, 876, 869, 881 (*Ehrlich*) (plur. opn. of Arabian, J.) [heightened scrutiny under the *Nollan/Dolan* test appropriate when monetary exactions are imposed ad hoc on an individual basis due to greater risk of arbitrariness and government abuse in such situations].) The requirements of *Nollan* and *Dolan*, however, do not extend to development fees that are generally applicable to a broad class

9

of property owners through legislative action. As our Supreme Court has explained, "legislatively prescribed monetary fees"--as distinguished from a monetary condition imposed on an individual permit application on an ad hoc basis--"that are imposed as a condition of development are not subject to the *Nollan/Dolan* test." (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 459, fn. 11 (*CBIA*), citing *San Remo Hotel, supra,* 27 Cal.4th at pp. 663-671 ["The 'sine qua non' for application of *Nollan/Dolan* scrutiny is . . . the 'discretionary deployment of the police power' in 'the imposition of land-use conditions in individual cases' "], and *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 966-967 (*Santa Monica*) [only individualized development fees--as distinguished from legislatively mandated, generally applicable development fees--are subject to the *Nollan/Dolan* test].)

B. *Mitigation Fee Act*

Effective January 1, 1989, the Mitigation Fee Act (§ 66000 et seq.) provides "a statutory standard against which monetary exactions by local governments subject to its provisions are measured." (*Ehrlich, supra*, 12 Cal.4th at p. 865.) It was enacted by the Legislature " 'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.' " (*Id.* at p. 864.) It provides uniform procedures for local agencies to follow in imposing development fees. (*Centex Real Estate Corp. v. City of Vallejo* (1993) 19 Cal.App.4th 1358, 1361.)

The Mitigation Fee Act defines a development fee as "a monetary exaction other than a tax or special assessment . . . that is charged by a local agency to the applicant in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project . . . ." (§ 66000, subd. (b).) "A fee shall not include the costs attributable to existing deficiencies in public facilities, but may include the costs attributable to the increased demand for public facilities reasonably related to the development project in order to (1) refurbish existing

10

facilities to maintain the existing level of service or (2) achieve an adopted level of service that is consistent with the general plan." (§ 66001, subd. (g).) " 'Public facilities' includes public improvements, public services, and community amenities." (§ 66000, subd. (d).) Any party may protest the imposition of a development fee by tendering the payment under protest and serving the governing body of the entity with written notice of the payment and the factual and legal bases for the protest. (See § 66020, subd. (a).)

There are two ways that a local agency can satisfy the Mitigation Fee Act's "reasonable relationship" requirement for the imposition of development fees. Section 66001, subdivision (a) requires the local agency to determine how there is a "reasonable relationship" between both "the fee's use and the type of development project on which the fee is imposed" and "the need for the public facility and the type of development project on which the fee is imposed." (§ 66001, subd. (a)(3), (4).)[4] Section 66001, subdivision (b) requires the more specific determination of a "reasonable relationship" between "the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed."[5]

---

[4] Section 66001, subdivision (a) provides: "In any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency, the local agency shall do all of the following: [¶] (1) Identify the purpose of the fee. [¶] (2) Identify the use to which the fee is to be put. If the use is financing public facilities, the facilities shall be identified. That identification may, but need not, be made by reference to a capital improvement plan as specified in Section 65403 or 66002, may be made in applicable general or specific plan requirements, or may be made in other public documents that identify the public facilities for which the fee is charged. [¶] (3) Determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed. [¶] (4) Determine how there is a reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed."

[5] Section 66001, subdivision (b) provides: "In any action imposing a fee as a condition of approval of a development project by a local agency, the local agency shall determine how there is a reasonable relationship between the amount of the fee and the cost of the

In *Ehrlich*, our Supreme Court concluded that the heightened scrutiny of the *Nollan*/*Dolan* test applies to ad hoc monetary exactions imposed as a condition of approving a development project by individual property owners. (*Ehrlich, supra*, 12 Cal.4th at pp. 881 (plur. opn. of Arabian, J).) There, the city had conditioned permits for the development of a condominium complex on the site of a former private tennis club on the owner's agreement to pay a $280,000 fee to be used for city recreational facilities. (*Id.* at pp. 861-863 (plur. opn. of Arabian, J.).) In holding that the fee at issue was subject to the *Nollan/Dolan* test, a plurality of our high court emphasized that because the city had exercised its discretionary powers in imposing and calculating the recreational impact fee, rather than doing so pursuant to a legislative mandate or formula, imposition of the fee bore much the same potential for illegitimate leveraging of private property as did the real property exactions in *Nollan* and *Dolan*. The court concluded that the heightened scrutiny of the *Nollan/Dolan* test is appropriate "[w]hen such exactions are imposed . . . neither generally nor ministerially, but on an individual and discretionary basis." (*Id.* at p. 876 (plur. opn. of Arabian, J.).)

However, as we have noted *ante*, while the *Nollan/Dolan* test applies to monetary land-use exactions which are imposed ad hoc on an individual and discretionary basis, it does not apply to generally applicable development impact fees imposed through legislative action. (*San Remo Hotel, supra*, 27 Cal.4th at pp. 666-667, 669-671.) In *San Remo Hotel*, our Supreme Court expressly declined to extend the *Nollan/Dolan* test to all development fees, "adhering instead to the distinction [drawn] in *Ehrlich* . . . between ad hoc exactions and legislatively mandated, formulaic mitigation fees." (*Id*. at pp. 670-671.) In doing so, the court explained: "While legislatively mandated fees do present some danger of improper leveraging, such generally applicable legislation is subject to

_____

public facility or portion of the public facility attributable to the development on which the fee is imposed."

12

the ordinary restraints of the democratic political process.  A city council that charged extortionate fees for all property development, unjustifiable by mitigation needs, would likely face widespread and well-financed opposition at the next election.  Ad hoc individual monetary exactions deserve special judicial scrutiny mainly because, affecting fewer citizens and evading systematic assessment, they are more likely to escape such political controls."  (*Id.* at p. 671.)

The *San Remo Hotel* court emphasized that legislatively imposed development impact fees that are not subject to the *Nollan/Dolan* test remain subject to the means-end judicial review under the Mitigation Fee Act.  (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 671.)  To be valid as a matter of both statutory and constitutional state law, such fees must satisfy the "reasonable relationship" test embodied in the Mitigation Fee Act.  (*Ibid.*; see *Enrlich, supra*, 12 Cal.4th at pp. 865, 867 ["developers who wish to challenge a development fee on either statutory or constitutional grounds must do so via the statutory framework provided by the [Mitigation Fee] Act"].)

II

*Demurrer*

Sheetz contends the trial court erred in sustaining the demurrer as to his first, fourth, and fifth causes of action.  He argues that his first and fifth causes of action state cognizable federal takings claims under the "unconstitutional conditions doctrine," and that his first and fourth causes of action state cognizable claims under the Mitigation Fee Act.  As we shall explain, we find no error.

A.  *Standard of Review*

The function of a demurrer is to test whether, as a matter of law, the facts alleged in the complaint state a cause of action under any legal theory.  (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1052.)  We assume the truth of all facts properly pleaded, as well as facts of which the trial court properly took judicial

13

notice.  But we do not assume the truth of contentions, deductions, or conclusions of law.  Our review of the trial court's decision is de novo.  (*Ibid.*)

A trial court's order sustaining a demurrer without leave to amend is reviewable for abuse of discretion.  (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1072.)  "If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred."  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

B.  *First Cause of Action:  Writ of Mandate*

1.  *Unconstitutional Conditions Doctrine*

Sheetz's first cause of action for writ of mandate alleges that the TIM fee effects an unlawful taking of property in violation of the special application of the "unconstitutional conditions doctrine" established in *Nollan* and *Dolan*.  On appeal, Sheetz contends the trial court erred in concluding that the *Nollan/Dolan* test does not apply to the fee as a matter of law.  We disagree.

We conclude the trial court properly determined that the TIM fee is not subject to the heightened scrutiny of the *Nollan/Dolan* test.  The fee is not an "ad hoc exaction" imposed on a property owner on an individual and discretionary basis.  Rather, it is a development impact fee imposed pursuant to a legislatively authorized fee program that generally applies to all new development projects within the County.  The fee is calculated using a formula that considers various factors.  Therefore, the validity of the fee and the program that authorized it is only subject to the deferential "reasonable relationship" test embodied in the Mitigation Fee Act.  (*San Remo Hotel, supra,* 27 Cal.4th at p. 667; *Ehrlich, supra*, 12 Cal.4th at pp. 865, 867 (plur. opn. of Arabian, J.).)  Indeed, as our Supreme Court has explained, the heightened scrutiny of the *Nollan/Dolan* test does not apply to legislatively mandated development impact fees that, as here, generally apply to a broad class of permit applicants.  (*CBIA, supra,* 61 Cal.4th at p. 459,

14

fn. 11, citing *San Remo Hotel, supra,* 27 Cal.4th at pp. 663-671; *Santa Monica, supra,* 19 Cal.4th at pp. 966-967.)

We are unpersuaded by Sheetz's contention that *Koontz* compels a contrary result. We have carefully reviewed *Koontz* and agree with our Supreme Court that it "does not purport to decide whether the *Nollan/Dolan* test is applicable to legislatively prescribed monetary permit conditions that apply to a broad class of proposed developments." (*CBIA, supra,* 61 Cal.4th at p. 459, fn. 11.) *Koontz* involved an adjudicative, individual and discretionary land-use determination, and the majority opinion does not address whether the *Nollan/Dolan* test applies to legislatively mandated, generally applicable formulaic development fees. As such, we find Sheetz's reliance on *Koontz* misplaced.[6]

We are also unpersuaded by Sheetz's suggestion that a different result is warranted because *Nollan* and *Dolan* involved legislatively prescribed, generally applicable

_____

[6] In rejecting the argument that subjecting monetary exactions to the *Nollan/Dolan* test would result in "no principled way of distinguishing impermissible land-use exactions from property taxes," the *Koontz* court explained that, because taxes and user fees are not takings, the decision "does not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners." (*Koontz, supra*, 570 U.S. at p. 615.) As Justice Mosk explained in his concurring opinion in *Ehrlich*, many development fees bear a close resemblance to various monetary exactions--excise taxes, assessment fees, and user fees--which courts have granted considerable discretion to local governments to impose and have upheld them against takings and related challenges. (See *Ehrlich, supra*, 12 Cal.4th at pp. 892-896 (conc. opn. of Mosk, J.) [reasoning that development fees "are perhaps best characterized as a special assessment placed on developing property" (*id*. at p. 896)].) As such, Justice Mosk concluded that the *Nollan/Dolan* test is generally *not* applicable to development fees; the test only applies "when the government engages in the physical taking or invasion of real and personal property, or singles out individual property owners by conditioning development permits on the payment of ad hoc fees not borne by a larger class of developers or property owners." (*Ehrlich*, at pp. 887-888 (conc. opn. of Mosk, J.).) In short, because the monetary exaction in *Koontz* was not a generally applicable development impact fee, the decision, in our view, cannot be read as compelling the application of the *Nollan*/*Dolan* test to the fee at issue here.

15

exactions. In *Lingle*, the United States Supreme Court characterized *Nollan* and *Dolan* as involving "Fifth Amendment takings challenges to adjudicative land-use exactions -- specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." (*Lingle, supra*, 544 U.S. at p. 546.) We find *Nollan* and *Dolan* to be of no assistance to Sheetz, as neither case involved legislatively mandated, formulaic development impact fees that applied to a broad class of proposed developments. Rather, both cases involved a real property dedication condition imposed on an ad hoc basis upon an individual permit application.

Equally misplaced is Sheetz's reliance on *Cedar Point Nursery v. Hassid* (2021) 141 S.Ct. 2063, a case he cites for the first time in his reply brief. In *Cedar Point*, a California regulation allowed representatives of a labor organization to enter an agricultural employer's property to solicit support for unionization for up to three hours per day, 120 days per year. (*Id*. at p. 2069.) The United States Supreme Court held that the regulation violated the takings clause because it "appropriate[d] a right to invade the growers' property and therefore constitute[d] a *per se* physical taking." (*Id*. at p. 2072.) The court reasoned that the regulation violated the right to exclude, which is " 'one of the most treasured' rights or property ownership." (*Ibid*.) In concluding that the regulation constituted a physical taking as opposed to a regulatory taking, the court explained that the "essential question is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." (*Ibid*.) "Thus, the Supreme Court has suggested that any government action, including administrative and legislative, that conditionally grants a benefit, such as a permit, can supply the basis for an exaction claim" under the unconstitutional conditions doctrine. (*Ballinger v. City of Oakland* (2022) 24 F.4th 1287, 1299 [concluding that " '[w]hat

16

matters for purposes of *Nollan* and *Dolan* is not *who* imposes an exaction, but *what* the exaction does' "].)

Cedar Point* is distinguishable. That case did not involve a generally applicable development impact fee imposed by a local agency as a condition for a land-use permit. Rather, it involved a state regulation that only applied to property owned by agricultural employers. And *Cedar Point* does not purport to address whether the heightened scrutiny of the *Nollan/Dolan* test applies to the circumstances presented here--a legislatively mandated, formulaic development impact fee that applies to a broad class of proposed developments. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.) Thus, contrary to Sheetz's contention, *Cedar Point* does not abrogate the rule--by which we are bound-- that generally applicable development fees are not subject to the *Nollan/Dolan* test. (See *CBIA, supra,* 61 Cal.4th at p. 459, fn. 11, citing *San Remo Hotel, supra,* 27 Cal.4th at pp. 663-671; *Santa Monica, supra,* 19 Cal.4th at pp. 966-967.)

2. *Mitigation Fee Act*

Sheetz's first cause of action for writ of mandate alleges that the County violated the Mitigation Fee Act because there is no "reasonable relationship" between the public impact of his development project and the need for improvements to state and local roads. On appeal, he contends the trial court erred in concluding that he could only state a cognizable claim under subdivision (a) of section 66001, rather than under both subdivision (a) and (b) of the statute. In making this argument, Sheetz insists that the County was required to evaluate the specific traffic impacts attributable to his particular project before imposing the fee. We disagree.

As noted *ante*, there are two ways that a local agency can satisfy the Mitigation Fee Act's "reasonable relationship" requirement for the imposition of development fees. (§ 66001, subds. (a), (b).) Section 66001, subdivision (a) applies to quasi-legislative decisions to impose development impact fees on a class of development projects, whereas

17

section 66001, subdivision (b) applies to adjudicatory, case-by-case decisions to impose a development impact fee on a particular development project.  The difference between these subdivisions is that only subdivision (b) of section 66001 requires an individualized more specific determination of reasonableness for each particular project.  (*Tanimura & Antle Fresh Foods, Inc. v. Salinas Union High School Dist.* (2019) 34 Cal.App.5th 775, 791; *Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 334-336.)  As a panel of this court recently explained in the context of development impact fees imposed to fund school facilities to accommodate the increase in students likely to accompany new development:  "For a general fee applied to all new residential development, a site-specific showing is not required.  Instead, this showing may be derived from districtwide estimations concerning new residential development and impact on school facilities.  The school district is not required to evaluate the impact of a particular development project before imposing fees.  Instead, the required nexus is established based on the justifiable imposition of fees on a class of development rather than particular projects."  (*AMCAL Chico LLC v. Chico Unified School District* (2020) 57 Cal.App.5th 122, 127; see also *Cresta Bella, LP v. Poway Unified School Dist*. (2013) 218 Cal.App.4th 438, 447.)  In short, we conclude the trial court properly determined that section 66001, subdivision (b) does not apply to Sheetz's development project.[7]

C.  *Fourth and Fifth Causes of Action:  Declaratory Relief*

Sheetz's fourth and fifth causes of action for declaratory relief allege that the County's policy of requiring new development to pay the full cost of constructing new

---

[7] Sheetz relies on *Ehrlich* and *Walker v. City of San Clemente* (2015) 239 Cal.App.4th 1350 in purported support of a contrary result.  However, neither of those cases discussed, let alone disagreed with, the relevant statutory analysis in *Garrick*.  Nor did either case expressly consider whether *both* subdivisions (a) and (b) of section 66001 apply to quasi-legislative local agency decisions to impose development impact fees on a class of development projects.  These cases do not inform the outcome here.  (See *People v. Ault*, *supra*, 33 Cal.4th at p. 1268, fn. 10.)

18

roads and widening of existing roads without regard to the cost specifically attributable to the particular project on which the fee is imposed resulted in an unlawful exaction of $23,420. According to Sheetz, the County's policy, "as applied" to him, violated the Mitigation Fee Act and the "unconstitutional conditions doctrine." On appeal, Sheetz contends the trial court erred in determining that his fourth and fifth causes of action failed as a matter of law because the sole remedy for "as applied" challenges to local agency action is administrative mandamus, not declaratory relief. We disagree.

We conclude the trial court properly sustained the demurrer to the fourth and fifth causes of action without leave to amend. It is well established that a declaratory relief cause of action is an appropriate method for challenging a statute, regulation, or ordinance as facially unconstitutional or otherwise invalid, but that administrative mandamus is "the proper and sole remedy" to challenge a local agency's application of the law (e.g., application of a zoning ordinance to a particular property). (See, e.g., *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 13-14; *Tejon Real Estate, LLC v. City of Los Angeles* (2014) 223 Cal.App.4th 149, 154-155; *Rezai v. City of Tustin* (1994) 26 Cal.App.4th 443, 448; *City of Santee v. Superior Court* (1991) 228 Cal.App.3d 713, 718-719; *Taylor v. Swanson* (1982) 137 Cal.App.3d 416, 418.)[8]

III

*Petition for Writ of Mandate*

Sheetz contends reversal is required because the TIM fee is invalid under both the heightened scrutiny of the *Nollan/Dolan* test and the "reasonable relationship" test embodied in the Mitigation Fee Act. According to Sheetz, the County's failure to make an *individualized* determination as to the traffic impacts *specifically* attributable to his

---

[8] We need not and do not consider Sheetz's contention that his first, fourth, and fifth causes of action are timely. The trial court did not rule that any of those claims were time-barred.

development project resulted in a violation of the takings clause of the federal and state constitutions as well as the Mitigation Fee Act.

For the reasons we have discussed, we reject this argument. The *Nollan/Dolan* test does not apply to the legislatively prescribed generally applicable development impact fee at issue here (see *CBIA, supra,* 61 Cal.4th at p. 459, fn. 11, citing *San Remo Hotel, supra,* 27 Cal.4th at pp. 663-671; *Santa Monica, supra,* 19 Cal.4th at pp. 966-967), and California law does not require an individualized or site-specific determination of reasonableness for each particular project subject to the fee (see *AMCAL Chico LLC v. Chico Unified School District, supra,* 57 Cal.App.5th at p. 127; *Cresta Bella, L.P. v. Poway Unified School Dist., supra,* 218 Cal.App.4th at p. 447). As we next explain, we also reject Sheetz's remaining argument that the administrative record contains no evidence establishing that the fee satisfies the "reasonable relationship" test embodied in the Mitigation Fee Act.

A.  *Standard of Review*

"The adoption of development impact fees under the Mitigation Fee Act is a quasi-legislative act, which we review under the standards of traditional mandate. [Citations.] 'We determine only whether the action taken was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law.' [Citations.] 'The action will be upheld if the [local agency] adequately considered all relevant factors and demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' " (*Boatworks, LLC v. City of Alameda* (2019) 35 Cal.App.5th 290, 298.) " 'This issue is a question of law. [Citation.] ' "On appeal, we independently review the agency's decision and apply the same standard of review that governs the superior court." ' " (*Walker v. City of San Clemente, supra,* 239 Cal.App.4th at p. 1362.)

"[T]he local agency has the initial burden of producing evidence sufficient to demonstrate that it used a valid method for imposing the fee in question, one that

established a reasonable relationship between the fee charged and the burden posed by the development." (*Home Builders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 562 (*City of Lemoore*).) "However, the figures upon which the public agency relies will necessarily involve predictions regarding population trends and future building costs, and they need not be exact. [Citation.] 'As a practical matter it will not always be possible to fashion a precise accounting allocating the costs, and consequent benefits, of particular building projects to particular portions of the population. All that is required of the [agency] is that it demonstrate that development contributes to the need for the facilities, and that its choices as to what will adequately accommodate the [new population] are reasonably based.' " (*Boatworks, LLC v. City of Alameda*, *supra*, 35 Cal.App.5th at p. 298.)

"If the local agency does not produce evidence sufficient to avoid a ruling against it on the validity of the fee, the plaintiff challenging the fee will prevail. However, if the local agency's evidence is sufficient, the plaintiff must establish a requisite degree of belief in the mind of the trier of fact or the court that the fee is invalid . . . ." (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 562.) "In general, the imposition of various monetary exactions, such as . . . impact fees, is accorded substantial judicial deference. [Citation.] In the absence of a legislative shifting of the burden of proof, a plaintiff challenging an impact fee has to show that the record before the local agency clearly did not support the underlying determinations regarding the reasonableness of the relationship between the fee and the development." (*Ibid.*)

B. *Analysis*

We begin by noting that Sheetz relies only on a select few pages from the more than 5,000-page administrative record in support of his writ of mandate cause of action, as he did in the trial court. Having reviewed those portions as well as the broader administrative record, we find no error in the denial of the petition for writ of mandate.

21

As relevant here, the administrative record discloses that the County's adoption of the 2004 General Plan was guided by policies that limit traffic congestion, including policies that ensure that roadway improvements are developed concurrently with new development and paid for by that development and not taxpayer funds. In September 2005, the County adopted the interim 2004 General Plan traffic impact mitigation fee program (i.e., the TIM fee program), which implemented the transportation and circulation policies of the general plan and set forth the fee rates (that must be updated annually) imposed at the building permit stage to mitigate the effects of each type of new development (e.g., single-family residence) in the County's eight geographical fee zones.[9] The interim program was adopted after the County considered the information contained in a technical report prepared by the DOT and studies analyzing the impacts of contemplated future development on existing public roadways and the need for new and improved roads as a result of the new development.

In August 2006, the County amended the general plan to permanently adopt the TIM fee program with adjusted new fee rates. This amendment occurred following the DOT's preparation of a detailed memorandum explaining the purpose of the fee, the use to which the fee was to be put, and the methodology used to calculate the fee rate for each type of new development. The memorandum indicated that the fee rates were developed after consideration of a variety of factors, including the expected increase in

---

[9] The TIM fee program was adopted to implement measure TC-B of the 2004 General Plan, which requires the County to adopt impact fees to mitigate roadway impacts from new development. That policy states, in part, that the "traffic fees should be designed to achieve the adopted level of service standards and preserve the integrity of the circulation system." As part of the process to implement the general plan, the County's Department of Transportation (DOT) led several interrelated studies to determine traffic projections, specific roadway improvement needs and projected costs, existing funding and funding sources, and a proposed TIM fee rate specific to eight fee zones and various types of new development.

22

traffic volumes (average daily vehicle trips) from each type of new development.  To estimate the vehicle trips or trip generation rates attributable to new development projects, the County relied on data published in the Institute of Transportation Engineers Trip Generation Manual, 7th Edition.[10]  Prior to the adoption of new fee rates in 2012, including the fee rate at issue here, the DOT explained the methodology it used to adjust the rates.

We conclude the County met its initial burden to demonstrate that it used a valid method for imposing the TIM fee, one that established a reasonable relationship between the fee charged and the burden posed by Sheetz's development of a single-family residence in geographic Zone 6.  The record reflects that the County considered the relevant factors and demonstrated a rational connection between those factors and the fee imposed.  We further conclude Sheetz has failed to show that the record before the County clearly did not support the County's determinations regarding the reasonableness of the relationship between the fee and his development project.  The limited portions of the record relied upon by Sheetz do not demonstrate that the fee was arbitrary, entirely lacking in evidentiary support, or otherwise invalid.

---

[10] In amending the 2004 General Plan to permanently adopt the TIM fee program, the County concluded that "[t]he facts and evidence presented in the reports, analyses, and a public hearing . . . establish that there is a reasonable relationship between the need for the described public facilities and the impacts of the types of development described, for which the corresponding fee is charged."  The County also concluded that "[t]he facts and evidence presented in the reports, analyses, and a public hearing . . . establish that there is a reasonable relationship between the fee's use and the type of development for which the fee is charged."

23

## DISPOSITION

The judgment is affirmed.  The County shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                                   /s/
                                       Duarte, Acting P. J.


We concur:


    /s/
Hoch, J.


    /s/
Earl, J.